RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0367P (6th Cir.)
File Name: 01a0367p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ALTON COLEMAN,
  *Petitioner-Appellant,*

  *v.*

BETTY MITCHELL, Warden,
  *Respondent-Appellee.*

No. 98-3545

———

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
Nos. 94-00863, 94-00864—Sandra S. Beckwith,
District Judge.

Argued: November 2, 2000

Decided and Filed: October 10, 2001

Before: BATCHELDER, COLE, and CLAY, Circuit
Judges.

———————————

**COUNSEL**

**ARGUED:** David C. Stebbins, Columbus, Ohio, for
Appellant. Charles L. Wille, OFFICE OF THE ATTORNEY
GENERAL OF OHIO, Columbus, Ohio, for Appellee.
**ON BRIEF:** David C. Stebbins, Columbus, Ohio, Dale A.
Baich, OFFICE OF THE FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ARIZONA, Phoenix, Arizona, for

Appellant.  Charles L. Wille, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee.

CLAY, J., delivered the opinion of the court, in which COLE, J., joined.  BATCHELDER, J. (pp. 55-58), delivered a separate opinion concurring in part and dissenting in part.

––––––––––––––

**OPINION**

––––––––––––––

CLAY, Circuit Judge.  Petitioner, Alton Coleman, appeals from the district court order denying Petitioner's motion, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, to alter or amend the district court order denying Petitioner's application for writ of habeas corpus pursuant to 28 U.S.C. § 2254 and lifting the stay of execution previously entered by the district court.  For the reasons set forth below, we **AFFIRM IN PART** and **REVERSE IN PART** and **REMAND** for further proceedings not inconsistent with this opinion.

**BACKGROUND**

**I.  Procedural History**

On October 10, 1984, a Hamilton County, Ohio, grand jury indicted Petitioner for the aggravated murder of Tonnie Storey, with death penalty specifications, as well as for the aggravated robbery of Storey.  On June 15, 1985, a jury found Petitioner guilty of aggravated murder under Ohio Revised Code § 2903.01 with one death penalty specification.[1]  The following day, the jury recommended the death penalty for Petitioner.  On June 24, 1985, following independent review

––––––––––––––

[1] Petitioner was found guilty of aggravated murder that was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender, which falls  under the Ohio Revised Code § 2929.04(A)(5) death penalty specification.

examination and presenting the results of such an examination to the jury would have produced a different result. Coleman was found competent to assist his counsel at trial. He was therefore competent to make the determination whether he wanted to have a presentence examination or a mental examination. Coleman refused to have any examination and then argued to the jury—without fear of any current expert testimony or evidence to the contrary[1]—that he was in fact mentally ill. Coleman was entitled to make that decision, but he is not entitled to a finding of *Strickland* prejudice because the result of that decision was not what he had hoped for.

Finally, the record simply does not support the majority opinion's conclusion that the fact that Coleman's trial counsel made a closing argument to the jury undermines the State's position that Coleman instructed his counsel not to present mitigation evidence. Counsel's closing argument did not even mention mitigation evidence. It was a dramatic and impassioned plea not to subject Coleman to the electric chair. It was wholly consistent with Coleman's own attempt to persuade the jury that if they voted for the death penalty for him, it would be that much easier for them to impose the death penalty the next time they were called upon to make such a decision.

I therefore respectfully dissent from that portion of the majority's opinion holding that the death sentence must be reversed because of ineffective assistance of counsel at the penalty phase of the trial.

---

[1]Under Ohio law, Coleman alone could have requested such examinations. *See* OHIO REV. CODE ANN. §§ 2929.024 and 2929.03(D)(1)(West 2001).

of aggravating and mitigating factors, the Court of Common Pleas of Hamilton County, Ohio sentenced Petitioner to death. The court then ordered that Petitioner be returned to federal custody, where Petitioner had been serving a twenty-year federal sentence for a 1984 conviction under 18 U.S.C. § 1201(a), the federal kidnaping statute. However, the court reserved the right of the State of Ohio to request custody of Petitioner in order to carry out the Ohio sentence from the Storey case, as well as to carry out a second death sentence, also imposed by the Court of Common Pleas in a separate trial, in connection with the murder of Marlene Walters.[2] The court imposed the death sentence in the Walters case in May of 1985, one month prior to imposing the separate death sentence in the Storey case.[3]

On October 7, 1987, the Ohio First Appellate District affirmed Petitioner's conviction and death sentence in the Storey case, which was upheld by the Ohio Supreme Court. On January 20, 1990, the United States Supreme Court denied *certiorari*. On January 31, 1990, the Ohio Supreme Court set an execution date of April 24, 1990, which, in March of 1990, the Ohio Supreme Court stayed for six months to allow Petitioner to file his post-conviction petition. Petitioner filed his post-conviction petition with the common pleas court on September 4, 1990, raising one hundred and four claims for relief. The common pleas court denied Petitioner's post-conviction petition, which was affirmed by the Ohio First

---

[2]In February of 1995, the district court granted Petitioner's motion to consolidate Case Number C-3-94-533 (federal kidnaping), Case Number C-1-94-863 (Storey murder), and Case Number C-1-94-864 (Walters murder). In May of 1998, this Court severed the consolidated cases, assigning Appeals Case Number 98-3545 to Case Number C-1-94-863, and Appeals Case Number 98-3546 to Case Number C-1-94-864. Appeals Case Number 98-3545, the Storey murder, is the case at hand. This Court has affirmed the district court decision in Appeals Case Number 98-3546. *Coleman v. Mitchell*, 244 F.3d 533 (6th Cir. 2001).

[3]Petitioner was transferred from federal to state custody for execution of the Ohio sentences while his direct appeals from his state court convictions were pending.

Appellate District in March of 1993. The Ohio Supreme Court subsequently declined jurisdiction over Petitioner's appeal.

On June 30, 1993, Petitioner filed an application for delayed reconsideration in the Ohio First Appellate District, which the court denied and was later affirmed by the Ohio Supreme Court. On October 7, 1994, the Ohio Supreme Court set Petitioner's execution date for January 5, 1995.

Following a ten-day stay of execution by the district court, on January 6, 1995, Petitioner filed petitions for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 in connection with the Storey and Walters cases, which were later consolidated on appeal. On February 10, 1998, the district court denied Petitioner's § 2254 petitions and lifted the stay of execution previously entered by the district court. On April 14, 1998, the district court denied Petitioner's motion to alter or amend the district court order pursuant to Federal Rule of Civil Procedure 59(e). Petitioner appeals.

## II.  Criminal History

The Ohio Supreme Court provided the following factual findings in connection with Storey murder:

On July 7, 1984, [Petitioner] and Debra D. Brown approached the home of the Reverend and Mrs. Millard Gay of Dayton, Ohio. After conversing with Mr. Gay, they stayed at the Gays' home from July 7 through July 9, 1984. [Petitioner] and Brown accompanied the Gays to religious services in Lockwood, Ohio, on July 9, 1984. The next day, the Gays drove appellant and Brown to downtown Cincinnati and dropped them off.

On July 11, 1984 at approximately 10:00 a.m., Tonnie Storey, age fifteen, left her home in Cincinnati wearing rusty brown cutoff shorts, a beige sleeveless blouse with yellow rings, blue tassel shoes and a Michael Jackson button. She was next seen at Bloom Junior High School at approximately 11:45 a.m. by a teacher.

meet the second prong of *Strickland*. Coleman was required to show that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Coleman has wholly failed to make this showing. The jury in the Storey case convicted Coleman of aggravated murder of a child, with the specification that the aggravated murder was part of a course of conduct involving a purposeful killing of or attempt to kill two or more persons. That jury had before it the evidence of Coleman's murderous course of conduct, described by the Ohio Supreme Court as "a unique, identifiable plan of criminal activity." *State v. Coleman*, 544 N.E.2d 622, 626 (Ohio 1989). The majority opinion here correctly notes that this plan—during the brief span of the summer of 1984—included:

the abduction and murder by ligature strangulation of a nine-year old African-American girl in Wisconsin; car theft in Illinois; abduction of two nine- or ten-year old African-American girls in Indiana, one of whom was murdered by ligature strangulation; murder of a twenty-five-year old African-American woman in Indiana by ligature strangulation; car theft and battery in Michigan; murder, in Ohio, of an African-American woman and her nine-year-old daughter by strangulation, whose family bracelet was later found under the body of Storey; car theft and battery in Ohio; and an additional murder and car theft in Ohio.

*Supra* majority at ___ n.9. In my view, there is no probability—let alone a reasonable probability—that the jury would have decided against imposing the death penalty had it been aware of the evidence of Coleman's miserable childhood that he now claims his counsel should have unearthed in spite of his adamant obstruction and refusal to cooperate, and presented to the jury over his objections.

Nor do I think there is any probability that requiring Coleman to submit to a psychological or psychiatric

consistently and adamantly" refused to cooperate in any way with any investigation into mitigation.

It is true that the record from Coleman's trial for the Storey murder does not reflect that Coleman was actually advised *during that trial* of his options with regard to the penalty phase of the trial. However, it is also clear from the materials Coleman has presented to this habeas court, as well as from this court's opinion in the companion habeas case, that he was well aware of those options; that he was competent to make the choices he made; and that he certainly knew by the time the guilty verdict in the Storey case was handed down that he not only could but should provide the jury some kind of reason not to impose another death sentence. He affirmatively waived his right to do that.

Even if his counsel were required under the reasoning of *Carter v. Bell*, 218 F.3d 581 (6th Cir. 2000), to undertake an independent investigation and to present evidence in mitigation, I would hold, for essentially the same reasons stated in the companion habeas case, *see Coleman v. Mitchell*, 244 F.3d at 545, that counsels' conduct was not deficient here. I acknowledge that in this case Coleman did not actively participate in the trial, as he did in his trial for the Walters murder, but he clearly knew that had he chosen to do so, he could have. The record in this case does not show that he ordered his counsel to pursue the residual doubt approach here, as he did in the other case, and I acknowledge that this is a significant distinction between the two cases. I believe, however, that the record here clearly demonstrates that the actions of Coleman's trial counsel—who did not represent him in the Walters trial but were representing him in the Storey matter during the entire time that the Walters trial was taking place—were "based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland v. Washington*, 466 U.S. 668, 691(1984).

Even if counsels' performance here was deficient, I would find that there has been no showing of prejudice sufficient to

Later that same day, between 5:00 and 6:00 p.m., a classmate saw Tonnie on the corner of May and Morgan Streets in Cincinnati in the company of a man and a woman. The classmate identified the man as [Petitioner]. When Tonnie had not returned home by 4:30 p.m. that day, her mother called the police and reported her missing.

On July 19, 1984, a body was discovered in an abandoned building on May Street by a real estate agent. A Michael Jackson button and a pair of brown shorts with keys in the pocket were discovered in the area where the body was found. The keys identified by decedent's father belonged to the Storey residence. The body was badly decomposed and identification was made through fingerprints. The body was identified as that of Tonnie Storey. The cause of death of Tonnie was homicidal asphyxia.

*State v. Coleman*, 544 N.E.2d 622, 624-25 (Ohio 1989). The Ohio Supreme Court also detailed Petitioner's other criminal activity during the summer of 1984, which included multiple assaults, thefts, and murders.[4] A summary of this criminal activity is presented in part IV of the discussion section below.

### III.  Mental History

On September 4, 1984, the district court referred Petitioner to the Federal Correctional Institution at Butner, North Carolina, for an evaluation of whether Petitioner was competent to stand trial on federal kidnaping charges. Sally Cunningham Johnson, M.D., and Jim Hilkey, Ph.D., conducted the evaluation, which was limited to Petitioner's mental competency to understand the federal kidnaping charges brought against him and ability to work with an attorney in defending against those charges. Within those parameters, Drs. Johnson and Hilkey found Petitioner to be

---

[4] *See State v. Coleman*, 544 N.E.2d 622, 626 n.1 (Ohio 1989).

mentally competent to stand trial. The findings did not address Petitioner's mental condition at the time of the Storey murder or at the time of the Storey trial.

Counsel stipulated to Petitioner's mental competency to stand trial in the Storey case. Petitioner argues on appeal that the examinations which resulted in him being found mentally competent were limited, and that independent investigation by Petitioner's counsel into Petitioner's social and mental history would have led to the presentation of substantial mitigating evidence at the penalty phase of Petitioner's trial. Petitioner's personal background, and counsel's role in investigating that background, are presented in part VII of the discussion section below.

## DISCUSSION

Petitioner's habeas application to the district court raised forty-eight grounds for relief. The district court found twenty-seven of those grounds to be procedurally barred, and the remainder non-meritorious or inappropriately presented in the federal habeas context. On appeal to this Court, Petitioner raises eight issues for review.

Because Petitioner's habeas application was filed in 1995, prior to the passage of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the pre-AEDPA standard of review applies. *See Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999). Under the pre-AEDPA standard, we presume the correctness of state court factual findings, which are rebuttable only by clear and convincing evidence, and we review determinations of law, or determinations involving mixed questions of law and fact, *de novo*. *Id*. (citing *Rickman v. Bell*, 131 F.3d 1150, 1154 (6th Cir. 1997), *cert. denied*, 523 U.S. 1133 (1998)).

---

## CONCURRING IN PART, DISSENTING IN PART

---

ALICE M. BATCHELDER, Circuit Judge, Concurrence-Dissent. I concur in all of the majority opinion except that portion that concludes that Coleman's death sentence must be reversed because his counsel were ineffective during the penalty phase of the trial.

The sentence of death we are called upon to review in this habeas proceeding was imposed approximately six weeks after a different jury imposed a death sentence on Coleman for the murder of Marlene Walters. This court affirmed the district court's denial of Coleman's petition for a writ of habeas corpus in that case. *Coleman v. Mitchell*, 244 F.3d 533 (6th Cir. 2001). In that case, we held that:

> Coleman admits that he did not cooperate with counsel regarding the investigation and identification of mitigating evidence; imposed restrictions upon counsel; and refused to submit to further psychological or psychiatric testing. *After presenting Coleman with his options,* counsel proceeded with the residual doubt theory *only* at Coleman's direction. Coleman was competent to stand trial and competent to assist his lawyer with strategic choices.

*Id*. at 545 (first emphasis added).

In the voluminous record presented to this court in the habeas proceeding before us today, Coleman includes a large collection of newspaper articles detailing the proceedings in the Walters case. Among those articles are accounts of Coleman's having told reporters that he was "real surprised" when the Walters jury imposed the death penalty, and that he "didn't expect it at all." Also in the voluminous record is Coleman's initial state-court post-conviction petition. Paragraph 364 of that petition, which is part of his fifty-sixth claim for relief, is Coleman's claim that he "specifically,

proceeding within 180 days after remand.  This decision does not affect any other sentence against Petitioner.

## I.  Procedurally Defaulted Claims

### A.  Adequate and Independent State Ground

Petitioner argues that the district court erred when it relied on the Ohio state court's application of *res judicata* under § 2953.21 of the Ohio Post-Conviction Act to procedurally bar many of Petitioner's federal constitutional claims raised in his habeas application.

In *State v. Perry*, the Ohio Supreme Court found that Ohio courts should apply the doctrine of *res judicata* when determining post-conviction relief under § 2953.21:

> Under the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment.

226 N.E. 2d 104, 108 (Ohio 1967).

Petitioner argues that *res judicata* under § 2953.21 was not an adequate and independent state ground on which to procedurally bar his habeas claims, and thus did not satisfy federal requirements under *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).  Under *Maupin*, the following is required of a state procedural rule which bars federal review of a habeas claim.  First, the rule must apply to the petitioner's claim, and the petitioner must have failed to comply with the rule.  Second, state courts must have actually enforced the rule.  Third, the rule must constitute an adequate and independent state ground justifying foreclosure of the federal constitutional claim.  "This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims."  *Id*. at 138.  If a state procedural rule satisfies the above three elements, default may nevertheless be excused if the petitioner has shown cause for violating the

state procedural rule and prejudice resulting from the alleged constitutional error. *Id*.

Petitioner argues that *res judicata* was an inadequate procedural bar in this case because he was denied a reasonable opportunity to present his claims in state court in violation of *Michel v. Louisiana*, 350 U.S. 91 (1955). However, this Court, in *Rust v. Zent*, 17 F.3d 155 (6th Cir. 1994), and *Riggins v. McMackin*, 935 F.2d 790 (6th Cir. 1991), has held that application of *res judicata* under § 2953.21 is an adequate and independent state ground justifying foreclosure of constitutional claims in habeas.

Petitioner argues that *Keener v. Ridenour*, 594 F.2d 581 (6th Cir. 1979), supports his position that application of *res judicata* under § 2953.21 was not an adequate and independent state ground for barring his habeas claims. In *Keener*, this Court found:

> The Ohio Supreme Court has construed the Post-Conviction Act to preclude judicial review of new issues in all but a limited number of circumstances. As a result, Ohio post-conviction collateral relief is not coextensive with federal statutory habeas corpus. So long as the Ohio Post-Conviction Act, as construed by the Supreme Court of Ohio in State v. Perry, remains unamended, there will be repeated instances in which an Ohio prisoner will present claims, cognizable in federal court, which have never been reviewed by the State courts of Ohio.

*Keener*, 594 F.2d at 590 (footnote omitted).

In *Riggins*, this Court did not address the coextensiveness of procedural default under the Ohio Post-Conviction Act and federal habeas. Rather, this Court simply concluded, under *Perry*, that petitioner was:

> precluded from raising his due process claim in Ohio state court because he had the opportunity to raise the issue during the course of his direct appeal and failed to do so . . . Thus, because Ohio law establishes a

system operates in an arbitrary and capricious manner, [a defendant] cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty." *McCleskey*, 481 U.S. at 306.

Further, the Ohio Supreme Court's review of Petitioner's death sentence under § 2929.05(A) in this particular case, which consisted of citations to "similar" cases involving "aggravated murders which were a part of a course of conduct involving a purposeful killing of or attempt to kill two or more persons", mirrored the state court review upheld in *McCleskey*.[21] In *McCleskey*, the Supreme Court upheld the reviewing state court's support for its conclusion of proportionality, which consisted of citations to cases "involving generally similar murders." *McCleskey*, 481 U.S. at 306.

Accordingly, we find that, under *Proffitt* and *McCleskey*, proportionality review under § 2929.05(A) does not violate due process or the Eighth Amendment. We also find that the Ohio Supreme Court's reliance on similar cases involving the § 2929.04(A)(5) death penalty specification to support its finding of proportionality in this case did not constitute, under *Proffitt* and *McCleskey*, an unconstitutional application of proportionality review.

For the reasons set forth above, we **AFFIRM IN PART** and **REVERSE IN PART** the district court decision; we **AFFIRM** in all respects the judgment of guilt entered on the jury's guilty verdict, but **REVERSE** the judgment of the death sentence because of the ineffective assistance of counsel at the penalty phase of the trial. We **REMAND** the case to the district court with instructions to issue a writ of habeas corpus vacating Petitioner's death sentence in Case Number 98-3545 due to ineffective assistance of counsel at the penalty phase of the trial, unless the State of Ohio conducts a new penalty

---

[21]*Coleman*, 544 N.E.2d at 634.

at least one juror could have found he did not deserve the death penalty." *Carter*, 218 F.3d at 592. Therefore, under *Strickland*, counsel's objectively unreasonable performance at the penalty phase of the trial, which likely affected the outcome such that confidence in the resulting death sentence is undermined, constituted ineffective assistance in violation of the Sixth Amendment.

## VIII.  Proportionality Review

Ohio Revised Code § 2929.05(A) requires Ohio appellate courts to review death sentences for proportionality: "[i]n determining whether the sentence of death is appropriate, [the reviewing court] shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases."

The Eighth Amendment bars punishments which are grossly disproportionate to their corresponding crime. *See Coker v. Georgia*, 433 U.S. 584, 592 (1977). "[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution--and, in particular, in accord with the Due Process Clause." *Evitts v. Lucey*, 469 U.S. 387, 401 (1985).

Petitioner argues that the State of Ohio, having opted for proportionality review, has not applied such review constitutionally. Specifically, Petitioner claims that the § 2929.05(A) standard of determining whether "the sentence is excessive or disproportionate to the penalty imposed in similar cases" is inadequate because reviewing courts need to base their review on more than mere comparison of death sentences across cases.

However, the Supreme Court has upheld proportionality review under Florida law where court "decisions are reviewed to ensure that they are consistent with other sentences imposed in similar circumstances." *Proffitt v. Florida*, 428 U.S. 242, 253 (1976). Moreover, the Supreme Court has found, "absent a showing that the . . . capital punishment

procedural bar to [petitioner's] due process claim, this court will not consider that claim unless [petitioner] establishes [cause and prejudice].

*Riggins*, 935 F.2d at 793 (citing *Perry*, 226 N.E.2d at 104).

In *Rust*, citing *Riggins*, this Court also found petitioner's habeas claims barred without reference to coextensiveness under *Keener*. Specifically, this Court found that petitioner was:

barred from presenting his constitutional claims to the state courts because he had the opportunity to raise the issues during the course of his direct appeal but failed to do so . . . Because [petitioner] failed to raise his constitutional issues in his direct appeal, and because [petitioner's] procedural default [under the Ohio *res judicata* doctrine] constituted an 'adequate and independent' state ground on which the state relied to foreclose judicial review of his constitutional claims, we may not consider [petitioner's] constitutional claims unless he can show [cause and prejudice].

*Rust*, 17 F.3d at 160-61 (citations omitted).

This Court in *Keener* cited several cases in support of its position that "because of the narrow interpretation placed on [Section] 2953.21 by the Ohio Supreme Court, collateral relief is often unavailable or ineffective as a State remedy." *Keener*, 594 F.2d at 590. However, these cases concerned forgiveness of the exhaustion requirement for habeas review, not the adequacy of *res judicata* under § 2953.21 as a state ground justifying foreclosure of a federal constitutional claim. One case, *Mackey v. Koloski*, 413 F.2d 1019, 1021 (6th Cir. 1969), stated:

[a]s we said in Terrell v. Perini . . . 414 F.2d 1231 [(6th Cir. 1969)], and Coley v. Alvis, 381 F.2d 870 [(6th Cir. 1967)], the Supreme Court of Ohio has interpreted Ohio Revised Code Section 2953.21 . . . so narrowly that it would afford the appellant no effective remedy . . . . We

hold that the appellant should not be required to apply for a delayed appeal of the denial of his motion to vacate his sentence in order to exhaust state remedies.

This Court's conclusion in *Keener*, after discussion of *Terrell*, *Coley*, and *Mackey*, did not concern whether *res judicata* under § 2953.21 was an adequate and independent state ground justifying foreclosure of federal constitutional claims; rather, *Keener* found that because petitioner's claim was not cognizable under § 2953.21, "he has exhausted available State remedies." *Keener*, 594 F.2d at 590. Conversely, *Rust* and *Riggins* spoke directly to the issue of *res judicata* under § 2953.21 as an adequate and independent state ground. *Rust* and *Riggins*, not *Keener*, are controlling as to Petitioner's claim; application of *res judicata* under § 2953.21 is an adequate and independent state ground for barring habeas review of constitutional claims.

However, Petitioner argues that the facts giving rise to the Ohio court's application of *res judicata* to his case render the ground inadequate in this particular instance. Petitioner cites *James v. Kentucky*, 466 U.S. 341, 348 (1984), to support his claim that *res judicata* under § 2953.21 was "not the sort of firmly established and regularly followed state practice that can prevent implementation of federal constitutional rights," and thus not an adequate state ground on which to rely in barring constitutional claims. The Supreme Court in *James* noted that a Kentucky rule's distinction between "instructions" and "admonitions" was "not strictly adhered to" and that the Kentucky Court of Appeals had reached decisions contrary to the rule "in several cases". *James*, 466 U.S. at 347-348.

Petitioner's demonstration of the Ohio courts' inconsistent application of *res judicata* under § 2953.21 consists of one case, *State v. Howard*, 537 N.E. 2d 188 (Ohio 1989). In *Howard*, a conviction was reversed in post-conviction proceedings because of an improper jury instruction. The court could have applied *res judicata*, in that the instruction issue could have been litigated on appeal, but chose to reverse

court's questions regarding the option for a pre-sentence investigation and mental evaluation do not establish *Faretta* as controlling in the face of substantial precedent by the Supreme Court and this Court on counsel's independent obligation to investigate the personal background of a defendant in preparation for the penalty phase of a capital trial.

However, for such objectively unreasonable performance to constitute ineffective assistance of counsel, *Strickland* requires that Petitioner show prejudice, satisfied by showing a reasonable probability that but for such performance the trial outcome would have been different. *Strickland*, 466 U.S. at 694. "Reasonable probability" is "a probability sufficient to undermine confidence in the outcome," but does not require showing that counsel's unreasonable performance more likely than not altered the outcome in the case. *Id*. at 693-94. "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams*, 120 S.Ct. at 1516. "[T]he graphic description of [defendant's] childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Id*. at 1515 (citation omitted). The sentencing phase is likely to be "the stage of the proceedings where counsel can do his or her client the most good," *Glenn*, 71 F.3d at 1207 (quoting *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir.), *cert. denied*, 493 U.S. 874 (1989)). It is reasonably probable that informing a jury of a capital defendant's low I.Q., deprived background, and psychiatric problems would affect the balance of aggravating and mitigating circumstances that had previously resulted in the death sentence. *Brewer*, 935 F.2d at 858-859.

We find, given Petitioner's personal background, psychological history, and potential organic brain dysfunction, that it is reasonably probable that the presentation of even a substantial subset of the mitigating evidence detailed above "would have humanized [Petitioner] before the jury such that

The Supreme Court has found that counsel's failure to investigate a defendant's background in preparation for the penalty phase of a capital trial constituted ineffective assistance, even when counsel presented an alternative argument, highlighting the defendant's remorse and cooperation with police, in mitigation:

> the failure to introduce the comparatively voluminous amount of evidence that [supported defendant] was not justified by a tactical decision to focus on [defendant's] voluntary confession . . . . [T]hose omissions . . . clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background.

*Williams v. Taylor*, 529 U.S. 362, 396 (2000)(citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1980)).

Reasonable investigation by counsel would have produced at least a sampling of the background information provided above because those reports relied on varied, discoverable sources, including school records, hospital records, prison records, prison medical records, police records, statements by family members and acquaintances, previous psychiatric and psychological evaluations, and pre-sentence investigation reports. While production of the F.B.I. records on Petitioner's background would have assisted counsel's investigation, F.B.I. retention of those records did not render counsel helpless.

Under *Williams*, *Carter*, *Skaggs*, *Austin* and *Glenn*, we find counsel's performance, given the combination of Petitioner's uninvestigated personal history and the consequently deficient penalty phase closing argument, to be objectively unreasonable. Petitioner's negative responses to the trial

and other drugs, borderline personality disorder and brain dysfunction, in combination, almost guarantee that he would have extremes of behaviors." (J.A. at 874.)

the conviction instead. However, *Howard* failed to address the *res judicata* issue directly. Moreover, even assuming that *Howard* supported Petitioner's position, one decision does not likely establish "inconsistent application" of a procedural rule. "[A]n occasional act of grace by a state court in excusing or disregarding a state procedural rule does not render the rule inadequate." *Amos v. Scott*, 61 F.3d 333, 342 (5th Cir. 1995), *cert. denied*, 516 U.S. 1005 (1995). Further, as discussed above, *James* referenced "several cases" in support of its finding a Kentucky rule to have been inconsistently applied. We do not find that the Ohio Supreme Court's failure to apply *res judicata* in *Howard* precludes its qualification as an independent and adequate state ground under *Maupin*.

Petitioner then argues against application of the rule of *Ohio v. Murnahan*, 584 N.E. 2d 1204 (Ohio 1992), to his case. In *Murnahan*, the Supreme Court of Ohio held that claims of ineffective assistance of appellate counsel are not cognizable in post-conviction proceedings pursuant to § 2953.21. *Id.* at 1208. The *Murnahan* court instructed that colorable claims of ineffective assistance of appellate counsel, for which the application of *res judicata* would be unjust, should be presented in an application for delayed reconsideration in the court of appeals where the alleged error took place pursuant to Ohio Appellate Rules 26 and 14(B). *Id.* at 1209.

Defendant in *Murnahan*, like Petitioner in this case, had pursued his claim of ineffective assistance of appellate counsel by request for post-conviction relief pursuant to § 2953.21. Petitioner argues that the Ohio courts in his case, as in *Murnahan*, should have permitted Petitioner to apply for delayed reconsideration in the Ohio court of appeals.

*Murnahan* was decided in February of 1992. In June of 1993, Petitioner filed his *Murnahan* application for delayed reconsideration of his appeal based on ineffective assistance of appellate counsel. In February of 1994, the Ohio First Appellate District found Petitioner's *Murnahan* application to

be time-barred under Appellate Rule 26(B), which requires applications for reopening to be filed within ninety days after entry of appellate judgment. Appellate Rule 26(B), an amendment to the Ohio Rules of Appellate Procedure, became effective July 1, 1993, after Petitioner had filed his *Murnahan* application.

Former Ohio Appellate Rule 26, in effect at the time of the *Murnahan* decision, required that applications for reconsideration be filed by the later of the court's filing of the decision or within ten days of the announcement of the decision, a time limit that the court could extend for good cause under Ohio Appellate Rule 14(B).

Ohio Appellate Rule 33(M) states that amendments to the Rules of Appellate Procedure that took effect on July 1, 1993, such as Appellate Rule 26(B), govern proceedings pending on July 1, 1993, except where application of the amended rules to those actions would cause injustice, in which case the former procedure applies. *See Ohio v. Reddick*, 647 N.E. 2d 784, 786 (Ohio 1995).

Good cause must be shown for a late filing of a motion for reconsideration under either former Appellate Rules 26 and 14(B) or current Appellate Rule 26(B): "the good-cause requirement of App.R. 26(B) succeeds and incorporates the good-cause requirement of *Murnahan* and former App.R. 14(B)." *Reddick*, 647 N.E. 2d at 786. Petitioner argues that the sixteen months separating the *Murnahan* decision from his motion for reconsideration should not bar his claim because during that time he was actively litigating the applicability of *Murnahan* to his case before the Ohio First Appellate District. However, Petitioner has not offered legal support for the claim that litigating the applicability of *Murnahan* to his case constituted good cause for filing his *Murnahan* application sixteen months after the *Murnahan* decision.

Even assuming that Petitioner had shown good cause for his delay in filing for reconsideration, Petitioner, in his habeas application, offered no argument that the claims omitted by

(J.A. at 2710, 2725, 2742-43). Dr. Hilkey also found Petitioner to have elevated test results under the psychopathic-deviant and paranoia categories, as well as a full-scale I.Q. score of 82, falling in the low-normal range, and a verbal I.Q. score of 79, falling at the upper limits of the borderline retarded range.

Dr. Johnson found that Petitioner had probable mixed personality disorder with antisocial, narcissistic and obsessive features. Further, an earlier psychiatric evaluation of Petitioner conducted in 1976 by Leo M. Goldman, M.D., found that Petitioner qualified as a "Borderline Personality". (J.A. at 895.)

In addition, reports conducted subsequent to the trial, which included independent evaluation of Petitioner's personal history, diagnosed Petitioner, at the time of the trial, as having borderline personality disorder,[17] a likelihood of organic brain dysfunction,[18] as well as probable manic-depressive psychosis.[19] Drs. Elkun, Ramsden, and Lewis agreed that Petitioner was not competent to represent himself at the penalty phase of the trial.[20]

---

[17] Leonard Elkun, M.D., James R. Evans, Ph.D., and Mark Ramsden, Ph.D., reached this conclusion in separate reports. Dr. Elkun commented that Petitioner was, in his opinion, "one of the most exemplary cases [of borderline personality disorder] I have seen in quite some time . . . one sees a childhood and infancy and early adulthood replete with abuse, dysfunctionality, disruptive environment . . . often an individual who's left to fend for themselves, and to establish . . . their own rules if, in fact, they establish any." (J.A. at 931.)

[18] Report by Dr. Evans.

[19] Report by Dorothy Otnow Lewis, M.D.

[20] Dr. Evans did not comment on Petitioner's competency to represent himself, but noted that "persons suffering from borderline personality disorder usually show extremes of emotion, impulsive behaviors and transient psychotic episodes characterized by delusions, hallucinations and disassociation. In [Petitioner's] case, abuse of alcohol

counsel where the "ultimate decision that was reached not to call witnesses [for mitigation] was not a result of investigation and evaluation, but was instead primarily a result of counsels' eagerness to latch onto defendant's statements that he did not want any witnesses called."

Counsel in the case at hand failed to present to the jury any aspects of Petitioner's personal history, which, according to various psychiatric and psychological reports contained in the record, which in turn relied on myriad affidavits, background reports, and mental evaluations,  included the following: Petitioner's grandmother, who was his primary caretaker, abused him both physically and psychologically, as well as neglecting him while running her home as a brothel and gambling house.  Petitioner's grandmother involved him in her voodoo practice by having him kill animals and collect their body parts for use in her magic potions, as well as instructing Petitioner to eat food only prepared by her because she believed that their home was surrounded by enemies who wanted to poison them.  Petitioner was exposed to group sex, sometimes including his mother or grandmother, as well as bestiality and pedophilia.  Petitioner's mother spent lengthy periods of time in psychiatric hospitals, and was said to have abandoned Petitioner as an infant by leaving him in a garbage can.  Petitioner was admitted to the hospital on two occasions for head injuries.  Petitioner dropped out of high school in the ninth grade.

Prior to the penalty phase of the trial, Petitioner's counsel did not contact either Dr. Johnson or Dr. Hilkey, both of whom had prepared psychological reports of Petitioner in connection with Petitioner's competency to stand trial in the federal kidnaping case.  Drs. Johnson and Hilkey found Petitioner mentally competent to stand trial in the federal kidnaping case, but this finding was limited to the federal kidnaping charge, and did not include any independent investigation into Petitioner's past.  Dr. Hilkey noted that Petitioner had a "need to present himself as emotionally sound" and had "a tendency to project himself in a positive psychological light . . . [and] deny psychological problems,"

counsel were stronger than those raised by counsel on appeal. "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986).

As noted by the district court, appellate counsel for Petitioner raised twelve assignments of error on appeal, which were grounded in dozens of specific issues for review. Petitioner, in the forty-fourth ground for relief in his habeas petition to the district court, identified some seventy-five additional issues which appellate counsel had "failed to raise". (J.A. at 214.)

The Supreme Court, in *Jones v. Barnes*, 463 U.S. 745 (1983), found that the professional judgment of appellate counsel includes the determination of which colorable claims to raise on appeal, and that appellate counsel is not ineffective when failing to raise every colorable claim.  Indeed, the argument for ineffective assistance of appellate counsel may have been stronger had every colorable claim actually been raised:

> Most cases present only one, two, or three significant questions . . . . Usually . . . if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention.  The effect of adding weak arguments will be to dilute the force of the stronger ones.

*Barnes*, 463 U.S. at 752 (quoting R. Stern, Appellate Practice in the United States 266 (1981)).  Petitioner argues that appellate counsel would have been more effective by raising nearly ninety, rather than twelve, issues on appeal.  The Supreme Court in *Barnes* rejected such reasoning.

Petitioner also argues that the district court's analysis of his ineffective assistance of appellate counsel claim failed to review required considerations as provided in *Mapes*.  In *Mapes*, this Court suggested eleven considerations "that ought

to be taken into account in determining whether an attorney on direct appeal performed reasonably competently." *Mapes*, 171 F.3d at 427. Although Petitioner argues that the district court's analysis of the individual claims not raised by counsel on appeal was insufficient, Petitioner's habeas application itself lacked any factual specifics underlying those omitted claims. After enumerating the seventy-five claims unraised on appeal, Petitioner alleged:

> At the time of [Petitioner's] appeals, the above issues were recognized and accepted as viable issues by effective attorneys practicing capital litigation and having knowledge concerning the capital litigation process. Prevailing professional norms prescribed that capital appellate counsel must raise these issues on appeal . . . . The performance of appellate counsel in failing to raise these issues was deficient. Appellate counsel's performance was below prevailing professional norms of reasonably competent counsel.

(J.A. at 223.) Petitioner did not allege in his petition facts which may have lent particular importance to some of the seventy-five omitted claims relative to the strategic value of the twelve claims actually raised on appeal. Even if reviewing the merits of Petitioner's ineffective assistance of appellate counsel claim, Petitioner's argument that prevailing professional norms require reasonably competent counsel in capital cases to raise a particular set of at least seventy-five claims on appeal is contrary to *Barnes* and, given the lack of alleged facts underlying Petitioner's claim, beyond the scope of fact-intensive review under *Mapes*.

Finally, Petitioner argues that the *Murnahan* "substantive showing" standard violates *Anders v. California*, 386 U.S. 738 (1967), as reiterated in *Smith v. Robbins*, 528 U.S. 259 (2000). The Supreme Court clarified in *Robbins* that states are free to adopt procedures for protecting a defendant's right to appellate counsel which are different from the procedure presented by the Supreme Court in *Anders*, so long as such procedures "adequately safeguard a defendant's right to

present a mental health defense or to testify should not preclude counsel's investigation of these potential factors. Under the American Bar Association guidelines for appointed death penalty defense counsel, "[t]he investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." American Bar Association, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1.c (1989). We agree, therefore, with the district court's conclusions that defense counsel made no investigation into [defendant's] family, social or psychological background and that the failure to do so constituted representation at a level below an objective standard of reasonableness.

*Carter*, 218 F.3d at 596. Specifically, the defendant in *Carter* "reacted violently to the idea of a mental health defense [and] never volunteered any information about his family background or childhood [, and] members of [defendant's] family were uncooperative." *Id*. Thus, under *Carter*, Petitioner's decision not to request a pre-sentence investigation or mental examination did not relieve counsel of his duty to investigate Petitioner's background in preparation for the penalty phase of the trial.

It is not only this Court that has strongly established defense counsel's Sixth Amendment duty to independently investigate in preparation for the penalty phase of a capital trial. In addition to the Tenth Circuit *Battenfield* decision, the Seventh Circuit has found that "defense counsel's failure to investigate the mental history of a defendant with low intelligence demonstrates conclusively that [counsel] did not make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors." *Brewer v. Aiken*, 935 F.2d 850, 857 (7th Cir. 1991)(citation and internal quotations omitted). The Eleventh Circuit, in *Blanco v. Singletary*, 943 F.2d 1477, 1501-02 (11th Cir. 1991), found ineffective assistance of

could not be found, or that counsel made a reasoned decision to withhold the information for tactical or strategic reasons. The information was not presented to the jury because counsel never took the time to develop it.

This Court, in *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997), reenforced *Glenn*:

The Eighth Amendment requires a jury to consider the circumstances of the crime and the defendant's background and character during the sentencing phase of a capital trial . . . . The Constitution also requires defense counsel to reasonably investigate a defendant's background and present it to the jury. Failure to investigate or present mitigating evidence at sentencing may constitute ineffective assistance of counsel.

*Austin*, 126 F.3d at 848 (citing *Glenn*, 71 F.3d 1204, 1206-08)(citations omitted). This Court in *Austin* then concluded that counsel's failure to investigate and present mitigating evidence at the penalty phase of the trial, on grounds that counsel "did not think it would do any good," constituted ineffective assistance. *Austin*, 126 F.3d at 849. Similarly, this Court in *Mapes* found that "when a client faces the prospect of being put to death unless counsel obtains and presents something in mitigation, minimal standards require some investigation." *Mapes*, 171 F.3d at 426. This Court has also found ineffective assistance where counsel "failed to present the jury with a realistic view of [defendant's] mental status" due to inadequate preparation for the penalty phase of the trial. *Skaggs v. Parker*, 235 F.3d 261, 269 (6th Cir. 2000).

Further, defendant resistance to disclosure of information does not excuse counsel's duty to independently investigate:

The sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility. We find that reluctance on [defendant's] part to

appellate counsel." *Robbins*, at 264. A procedure satisfying the "adequate safeguard" standard is one that "reasonably ensures that an indigent's appeal will be resolved in a way that is related to the merit of that appeal." *Id*. at 279.

The Supreme Court in *Robbins* stated that under *Anders*, the Fourteenth Amendment requires that prior to dismissing a direct appeal, a state must fairly assess whether such appeal is frivolous. *Robbins*, 528 U.S. at 270-71. In contrast, merely finding an appeal to be meritless is an insufficient ground for excusing the state's obligation to address the claim. Petitioner argues that the *Murnahan* standard, which allows appellate courts to dismiss a *Murnahan* application if no "substantive" showing in support of the ineffective assistance of appellate counsel claim has been made, *Murnahan*, 584 N.E. 2d at 1209, denies defendants their Fourteenth Amendment right under *Robbins* to adequate and effective appellate review.

However, Petitioner's *Murnahan* application was not dismissed for failure to make a substantive showing in support of his ineffective assistance of appellate counsel claim; rather, the *Murnahan* application was dismissed for exceeding the time limit for filing under Appellate Rule 26(B), a procedural bar that does not implicate *Robbins* or *Anders*. Due to this late filing, the Ohio appeals court did not review Petitioner's *Murnahan* application for substance. Thus, the *Murnahan* standard that Petitioner is challenging under the Fourteenth Amendment was not applied to his motion for reconsideration. Even if this Court were to find *Murnahan*'s "substantive showing" requirement invalid under *Robbins*, Petitioner's *Murnahan* application would remain procedurally barred. "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Assoc.*, 485 U.S. 439, 445 (1988).

We find that under *Rust* and *Riggins*, *res judicata* under § 2953.21 is an adequate and independent state ground for

barring habeas review of constitutional claims.  We also find that Petitioner has not demonstrated good cause for failing to meet Appellate Rule 26(B) filing requirements, and that such procedural default precludes review of the "substantive showing" standard of *Murnahan* in light of *Robbins*.

## B.  Ineffective Assistance of Appellate Counsel as Cause

Petitioner next argues that even if his claim of ineffective assistance of counsel was procedurally defaulted, nevertheless it may serve as cause for his other procedurally defaulted claims under *Carpenter v. Mohr*, 163 F. 3d 938 (6th Cir. 1998).  However, the Supreme Court has since held that a procedurally defaulted ineffective assistance of counsel claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can satisfy the "cause and prejudice" standard with respect to the ineffective assistance claim itself. *Edwards v. Carpenter*, 529 U.S.446 (2000).  Petitioner has not forwarded any cause and prejudice argument in connection with his defaulted ineffective assistance of appellate counsel claim.  Thus, under *Edwards*, Petitioner's defaulted ineffective assistance of appellate counsel claim may not be used as cause for Petitioner's other defaulted habeas claims.

## II.  Evidentiary Hearing

Petitioner requested an evidentiary hearing in the district court to further develop the factual bases of his constitutional claims.  The district court denied Petitioner's request, on grounds that Petitioner had failed to rebut the presumption of correctness afforded state court findings of fact under 28 U.S.C. § 2254(d).  Petitioner argues that because the state procedure provided was inadequate to afford a full and fair hearing, the district court, under *Townsend v. Sain*, 372 U.S. 293 (1963), was obligated to grant Petitioner an evidentiary hearing.  In the alternative, Petitioner argues that the district court, in its discretion, should have granted  an evidentiary hearing, under *Sims v. Livesay*, 970 F.2d 1575 (6th Cir. 1992), because Petitioner was denied an evidentiary hearing in state court.

school educated man who had previously represented himself in a criminal prosecution, reasoned that he did not want to be represented by a public defender because that office was overloaded with cases.  *Id*. at 807.  Defendant in *Faretta* faced a criminal charge of grand theft.

Applying *Faretta* to a capital case, involving a defendant with low intelligence, limited education and an unsettling past, whose strongest demand for self-representation consisted of "No, I don't" responses when asked if he wanted a pre-sentence investigation and mental evaluation, hollows the Sixth Amendment.  Requiring counsel to independently investigate Petitioner's personal background does not "thrust counsel upon the accused, against his considered wish," *Faretta*, 422 U.S. at 820, especially where, as in this case, the record   fails to indicate both Petitioner's mitigation preferences and the informed consideration supporting such preferences.   In *Faretta*, "the record affirmatively show[ed] that [defendant] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will." *Faretta*, 422 U.S. at 835.  There is no such record support in this case.  Also under *Faretta*, a defendant "must first be 'made aware of the dangers and disadvantages of self-representation.'" *Martinez v. Court of Appeal of Calif.*, 528 U.S. 152, 162 (2000) (quoting *Faretta*, 422 U.S. at 835). Again, the record offers no indication that Petitioner was so made aware in this case.

Moreover, the independent obligation of defense counsel to investigate and present mitigating evidence at the penalty phase of a capital trial is well-established by this Court.  In *Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir. 1995), *cert. denied* 519 U.S. 910 (1996), this Court found ineffective assistance of counsel at the penalty phase of a trial where:

the jury was given virtually no information on [defendant's] history, character, background and organic brain damage--at least no information of a sort calculated to raise reasonable doubt as to whether this young man ought to be put to death.  It was not that such information

*Faretta v. California*, 422 U.S. 806, 820 (1975)(citations omitted).[16]

However, *Faretta* is not applicable to these facts, as illustrated by the Supreme Court's emphasis in the case on the defendant's independent, express and legitimate desire in self-representation:

> Here, weeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the 'ground rules' of trial procedure.

*Faretta*, 422 U.S. at 836. The *Faretta* decision included a lengthy colloquy between the judge and the unrepresented defendant, discussing defendant's independent legal research on exceptions to the hearsay rule, the grounds for challenging a juror for cause, and trial procedure generally under the California Codes. *Id*. at 811. Defendant in *Faretta*, a high-

---

[16]Similarly, this Court has recently found, in *Coleman v. Mitchell*, 244 F.3d 533, 545 (6th Cir. 2001) [hereinafter "*Coleman I*"], that where counsel explained the various penalty phase mitigation options to the defendant, and where the defendant clearly instructed counsel to proceed with a residual doubt theory in mitigation, counsel was not ineffective for following the defendant's clear and informed instruction. Conversely, the ineffective assistance analysis in this case concerns two elements not at issue in *Coleman I*. First, whether Petitioner's purported instruction to counsel, to limit mitigation to Petitioner's own unsworn statement, was given at all. Second, assuming Petitioner gave such an instruction, whether the instruction was informed by counsel's presentation of various mitigation strategy options. Unlike *Coleman I*, the ineffective assistance of counsel claim in this case raises different questions, specifically the substance and informed nature of Petitioner's purported instruction to counsel, and requires review of a different record. Accordingly, *Coleman I* does not control Petitioner's ineffective assistance of counsel claim in this case.

---

Because Petitioner filed for habeas relief prior to the passage of the AEDPA, that statute's amendments to 28 U.S.C. § 2254(d) do not apply to this case. This Court, in *Scott v. Mitchell*, 209 F.3d 854, 863 (2000), summarized our standard of review for state court factual findings under pre-AEDPA § 2254(d): "we presume primary, or historical, factual findings by the state courts to be correct, rebuttable only by clear and convincing evidence under one of the eight conditions listed in the pre-AEDPA version of 28 U.S.C. § 2254(d)(1-8)."[5]

The district court relied on *Mitchell v. Rees*, 114 F.3d 571 (6th Cir. 1997), when denying Petitioner's evidentiary hearing request. *Rees* held that "[b]ecause § 2254(d) is an express limitation on the district court's jurisdiction, a district court is without authority to hold an evidentiary hearing on a matter on which the state court has made findings unless one of the factors contained in § 2254(d) applies." *Id*. at 577.

*Townsend* found that "[w]here the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." *Townsend*, 372 U.S. at 312. *Townsend* then listed six circumstances in which a federal court must grant an evidentiary hearing to a habeas applicant.

*Townsend* was decided prior to passage of the 1966 amendments embodied in § 2254(d). The 1966 amendments were intended by Congress to limit the exercise of federal court jurisdiction. *See Rees*, 114 F.3d at 576. In *Fowler v.*

---

[5]Of the eight § 2254(d) conditions, Petitioner's argument may potentially appeal to several, namely that: (1) the merits of the factual dispute were not resolved in the State court hearing; (2) the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing; (3) the material facts were not adequately developed at the State court hearing; (6) the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or (7) the applicant was otherwise denied due process of law in the State court proceeding.

*Jago*, 683 F.2d 983, 988 (6th Cir. 1982), this Court found that the eight exceptions allowing for the setting aside of the presumption of correctness under § 2254(d) "appear to subsume the six Townsend criteria."

In addition, we noted in *Fowler* that "in order to eliminate the need for an independent federal evidentiary hearing, the district court must examine the findings of the state court to determine whether the state trier of fact reliably found the material facts and rejected the claim on its merits." *Id.* at 987. Further, "[u]nder . . . § 2254(d) . . . the district court must conduct an inquiry into whether the state court has adequately resolved the factual issues contained in the petitioner's constitutional claim." *Id.* at 988.

The district court in this case made such an inquiry:

[T]his Court has undertaken an independent assessment of the thousands of pages of trial transcripts, exhibits, motions, orders, submissions, and other documents to assess the thoroughness and reasoning of the state courts. In so doing, the Court has found that the state courts realized the essential and constitutional importance of these proceedings and conducted their fact-finding accordingly. Sufficient and extensive evidence was adduced at the . . . Storey guilt and punishment phases to establish each essential element of the crimes and the propriety of the sentences given.

(J.A. at 325.)

Petitioner asserts that the denial of an evidentiary hearing by both the Ohio state courts and the district court denied him the opportunity to develop the factual bases of his claims. Petitioner argues that not one of the Ohio state court factual findings is entitled to the presumption of correctness under § 2254(d), without identifying which specific material facts may rebut such findings. The cases Petitioner cites in support of his evidentiary hearing claim, *Correll v. Stewart*, 137 F.3d 1404 (9th Cir. 1998), and *Jones v. Wood*, 114 F.3d 1002 (9th Cir. 1997), are distinguishable in that defendants in both cases

of mitigation. As similarly expressed in *Battenfield*, "[i]n addition to hampering [defense counsel's] ability to make strategic decisions, [defense counsel's] failure to investigate [defendant's background] clearly affected his ability to competently advise [defendant] regarding the meaning of mitigation evidence and the availability of possible mitigation strategies." *Battenfield*, 236 F.3d at 1229.

Particularly in light of defense counsel's presentation at mitigation, the record in this case does not support finding either that Petitioner instructed his counsel not to present evidence at mitigation, or, even assuming such an instruction, that Petitioner had any understanding of competing mitigation strategies. We find the district court's conclusion regarding mitigation, that Petitioner's "counsel simply honored [Petitioner's] informed choices," baseless. (J.A. at 403.)

If the record indicated a clear, informed assertion by Petitioner that he did not wish his counsel to present any mitigation evidence in Petitioner's behalf, case law may have supported the district court's conclusion that counsel, merely respecting the informed wishes of a client, need not have investigated or presented any evidence in connection with Petitioner's background at the penalty phase of the trial. The Supreme Court has noted:

[The Sixth Amendment] speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant--not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists.

a "residual doubt" theory, such a mitigation strategy has since been rejected by the Ohio Supreme Court.[14]   Second, counsel's preference for a generalized, mercy-based critique of the electric chair over a particularized account of Petitioner's social and mental history mirrors the recent Tenth Circuit decision, *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001), where counsel's "failure to investigate [defendant's] background, and his failure to explore other readily apparent mitigation possibilities, rendered unreasonable his alleged penalty-phase strategy of focusing on sympathy and mercy."

We find defense counsel's presentation at the penalty phase of the trial significant for several reasons. First, it undermines the position that Petitioner had instructed his counsel not to present mitigation evidence in Petitioner's behalf. Second, it casts doubt on defense counsel's mitigation strategy under Ohio Revised Code § 2929.04(B).[15]   Third, our doubt as to counsel's mitigation strategy extends to counsel's ability to competently advise his client about the purpose and strategy

---

[14]"Residual doubt is not an acceptable mitigating factor under [Ohio Revised Code §] 2929.04(B), since it is irrelevant to the issue of whether the defendant should be sentenced to death." *State v. McGuire*, 686 N.E. 2d 1112, 1123 (Ohio 1997).

[15]The direct relationship between the quality of background investigation and the quality of mitigation strategy is well-settled. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. "The determination as to whether counsel's trial strategy amounts to ineffective assistance of counsel should be made with respect to the thoroughness of the pretrial investigation that counsel conducted." *White v. McAninch*, 235 F.3d 988, 995-96 (6th Cir. 2000). "[C]ounsel must make some effort at independent investigation in order to make a reasoned, informed decision as to [the utility of mitigating factors offered by defendant]." *Carter*, 218 F.3d at 596. Counsel "failed to conduct a constitutionally adequate pretrial investigation into potential mitigation evidence which, in turn, hampered his ability to make strategic choices regarding the [penalty phase] proceedings." *Battenfield*, 236 F.3d at 1234.

---

alleged specific facts contrary to state court findings which they anticipated an evidentiary hearing would further develop.[6]   Petitioner would likely have a stronger claim to an evidentiary hearing if the claim sought something less than a reconsideration of every factual determination made by the Ohio state courts, and was based on something more than the unarticulated facts which Petitioner alleges he was denied from presenting to the state courts and district court. Under *Rees*, Petitioner has not indicated, aside from mere passing reference, how any pre-AEDPA § 2254(d) exception applies to his case, and thus the district court did not err in denying his request for an evidentiary hearing.

### III.  Jury Instructions

Petitioner argues that improper jury instructions at both the guilt and penalty phases of the trial violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights.   Specifically, Petitioner claims that five separate jury instructions violated his constitutional rights.

On habeas review of state court jury instructions, the question for a federal court is "whether the ailing instruction by itself so infected the entire trial that the resulting

---

[6]For example, defendant in *Jones* sought to obtain "three categories of documents from his trial counsel: (1) copies of the notes [defendant] had given to his lawyer at the Snohomish County Jail on December 8, 1988; (2) copies of reports of pretrial interviews conduct by his lawyer and the defense investigators; and (3) copies of all documents which discuss or otherwise relate to the prosecutor's plea offer." *Jones*, 114 F.3d at 1009.

In *Correll*, defendant, in seeking an evidentiary hearing on the issue of ineffective assistance of counsel at the penalty phase of the trial, in addition to providing an affidavit from a probation officer and a psychological report, asserted "that during the month that elapsed between the jury verdict and the pre-sentencing hearing, his attorney met with him for just five minutes . . . [and] that his trial attorney had not requested a mental health diagnostic examination before sentencing . . . despite having previously deemed it necessary to move for the appointment of a mental health expert pursuant to Ariz. R. Crim. P. 11 to explore [defendant's] competency to stand trial." *Correll*, 137 F.3d at 1412-13.

conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)(quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

## A. Specific Intent/Aggravated Murder

Petitioner argues that the trial court erred by replacing the element of specific intent, required by Ohio Revised Code § 2903.01 (D) to find one guilty of aggravated murder, with proximate cause. Specifically, Petitioner argues that the trial court instructed the jury that to find Petitioner guilty of aggravated murder, the jury need only find that Petitioner was the principal offender in the aggravated burglary, not in the aggravated murder.

The crime of aggravated murder under Ohio law states, "no person shall purposely, and with prior calculation and design, cause the death of another[.]" Ohio Rev. Code § 2903.01(A). The trial court instructed the jury as follows:

> Before you can find the defendant guilty of aggravated murder . . . you must find that . . . defendant purposely caused [Storey's] death with prior calculation and design . . . . Purpose to kill is an essential element of the crime of aggravated murder. A person acts purposely when it is a specific intention to cause a certain result. It must be established in this count, that at the time in question, there was present in the mind of the defendant a specific intention to kill Tonnie Storey . . . . No person may be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another.

(J.A. at 2419-20).

Contrary to Petitioner's assertions, the jury instructions did not communicate that finding Petitioner to be the principal offender in the burglary was sufficient for finding guilt as to aggravated murder. Rather, the jury instructions clearly stated that finding Petitioner guilty of aggravated murder required finding that Petitioner "purposely caused [Storey's] death with prior calculation and design."

statement, if any, of the offender, and the arguments, if any, of counsel for the defense and prosecution, that are relevant to the penalty that should be imposed on the offender.

Two additional elements further cloud the record regarding the precise understanding between Petitioner and his counsel as to the extent of mitigation to be presented at the penalty phase of the trial: (i) the trial court's description to the jury of the procedural outline for the penalty phase; and (ii) counsel's own closing argument.

At the outset of the penalty phase of the trial, following Petitioner's waiver of a pre-sentence investigation and mental examination, the trial court explained to the jury that the defense, if it should so choose, would make an opening statement, followed by a presentation of evidence, which in turn would be followed by a closing argument. The defense waived an opening statement, but then presented both Petitioner's unsworn statement and counsel's closing argument. While Petitioner's wish may indeed have been to limit mitigation to his own unsworn statement, the record does not support such a conclusion, given both the lack of a clear expression of such preference by Petitioner and counsel's decision to present a closing argument following, and equal in length to, the unsworn statement.

Counsel's closing argument at the penalty phase of the trial focused on two issues: the circumstantial nature of the Storey murder evidence, and the evils of execution by electric chair.[13] The closing argument did not reference any aspect of Petitioner's personal history.

First, even assuming Petitioner's focus on the circumstantial nature of the murder evidence was premised on

---

[13] Ohio Revised Code § 2949.22 was amended in 1993 to provide the option for lethal injection as a form of execution. Rev. Code § 2949.22(B). At the time of Petitioner's trial, in 1985, electrocution was the only available form of execution under Ohio law.

the request is going to be granted. It will be continued until tomorrow morning.

(J.A. at 2468.)    To further support its conclusion that Petitioner wished to limit mitigation to his own unsworn statement, the district court quoted from Petitioner's unsworn statement to the jury:

I am not going to draw it out. I decided to cut it short. You all could have been here for the longest time. I told them I prefer[red] [that] you could go back home today on Sunday after you left church. I am going to cut it short. I am not going to talk for 60 to 70 minutes.

(J.A. at 2478-2479.)

Unlike the district court, we see a gap between Petitioner's decision to waive a pre-sentence investigation and mental examination and Petitioner's decision to limit mitigation exclusively to his own unsworn statement. First, the plain language of § 2929.03(D) distinguishes a pre-sentence investigation and a mental examination from "mitigation". Under § 2929.03(D), where death may be imposed as a penalty, "[a] pre-sentence investigation or mental examination shall not be made except upon request of the defendant." However, also under § 2929.03(D), a jury weighing aggravating and mitigating factors at the penalty phase of a capital trial may hear not only reports from a pre-sentence investigation and mental examination, but also:

any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing or to any factors in mitigation of the imposition of the sentence of death . . . testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing, the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, and any other factors in mitigation of the imposition of the sentence of death, and shall hear the

## B.  Recommendation of Death Penalty

Defendant next argues that the trial court's instructions led jurors to think that the ultimate decision-making responsibility for the death penalty lay elsewhere, in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

*Caldwell* held that a capital sentence is invalid "when the sentencing jury is led to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case."    *Caldwell*, 472 U.S. at 323.    This Court, in *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1101 (6th Cir. 1991)(*en banc*), found that a jury instruction and prosecutor's characterization of a jury's death sentence as a "recommendation" was consistent with Kentucky law and did not violate *Caldwell*.  *Kordenbrock* stated that "[i]n order to make out a *Caldwell* violation, [petitioner] must show that the prosecutor improperly described the jury's role under state law in order to water down their responsibility."  *Id*. (citing *Dugger v. Adams*, 489 U.S. 401 (1989)).

The relevant Ohio law is Ohio Revised Code § 2929.03(D):

If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender . . . . [I]f, after receiving . . . the trial jury's recommendation that the sentence of death be imposed, the court finds, by proof beyond a reasonable doubt . . . that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, it shall impose sentence of death on the offender. Absent such a finding by the court . . . the court . . . shall impose one of the following [life] sentences on the offender[.]

The trial court instructed the jury as follows:

All twelve jurors must agree upon a verdict. If all twelve members of the jury find, by proof beyond a reasonable doubt, that the aggravating circumstance which [Defendant] was found guilty of committing, outweigh the mitigating factors, then you must return such finding to the Court, and as a matter of law, you would have no choice but to recommend to the Court that the sentence of death be ordered.

The final decision as to whether the death penalty shall be imposed upon the defendant rests upon this Court after the Court follows certain additional procedures required by the laws, of this State. Therefore, even if you recommend the death penalty, the law requires the Court to decide whether or not the [D]efendant . . . will actually be sentenced to death or to life imprisonment.

(J.A. at 2511-12.)

"To establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger*, 489 U.S. at 407. In *Kordenbrock*, Kentucky law provided that "the jury shall retire to determine whether any mitigating or aggravating circumstances . . . exist and to recommend a sentence for the defendant. Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law." *Kordenbrock*, 919 F.2d at 1101 (quoting Ky. Rev. Stat. Ann. § 532.025(1)(b)). Because the judge's characterization of the jury's sentence as a "recommendation" was found, in *Kordenbrock*, not to violate *Caldwell*, we find the similar characterization of "recommendation" in this case, when Ohio law requires a separate, post-recommendation finding by the court confirming the jury's sentence, was also not in violation of *Caldwell*.

## C.  Reasonable Doubt at Sentencing

Petitioner argues that the trial judge's "reasonable doubt" instruction at the penalty phase of the trial violated due process. The district court held this claim to be procedurally

| | investigation or a psychiatric examination. |
|---|---|
| THE COURT: | I would like to hear that from your client himself. [Petitioner], do you wish to have a pre-sentence investigation? |
| [PETITIONER]: | No, I don't. |
| THE COURT: | Do you wish to have a mental examination? |
| [PETITIONER]: | No, I don't. |
| THE COURT: | Very well . . . Any reason that you know of, [Petitioner], why the sentencing portion of this proceeding should not proceed? |
| [PETITIONER]: | One moment. |
| (conferring with counsel) | |
| [COUNSEL]: | Judge, at this time [Petitioner] advises us that he feels that he would like to have some additional time to think about the statement that he would like to make to the jury. |
| THE COURT: | Will you consult with your client and ask him how long of time he thinks is required? |
| [COUNSEL]: | He has indicated just in the previous discussion that he would like to have at least overnight. |
| THE COURT: | Very well. In light of the fact . . . of the seriousness of this proceeding, |

"The Constitution requires States to allow consideration of mitigating evidence in capital cases." *Carter*, 218 F.3d at 594 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 442 (1990)). Consistent with this requirement, Ohio Revised Code § 2929.04(B) provides that in a capital case, if one or more aggravating circumstances have been proved beyond a reasonable doubt, the jury must consider and weigh the "nature and circumstances of the offense, the history, character, and background of the offender," as well as several enumerated mitigating factors, which include whether defendant suffered from a mental disease or defect at the time the offense was committed.

The district court found that counsel had "honored [Petitioner's] desire to conduct a mitigation phase hearing with only [Petitioner's] unsworn statement." (J.A. at 403.) By simply honoring Petitioner's stated wishes, the district court found, counsel had not provided ineffective assistance at the penalty phase of the trial.

The district court based its finding, that Petitioner expressly wished to limit his mitigation presentation to his own unsworn statement, primarily on a trial court colloquy among the judge, Petitioner, and Petitioner's counsel. This colloquy discussed Petitioner's decision not to request a pre-sentence investigation or mental examination prior to the penalty phase of the trial:

THE COURT:     [Counsel], it is my understanding you have had an opportunity to discuss in length whether or not your client wishes to request a pre-sentence investigation and a mental examination, is that correct?

[COUNSEL]:     That's correct.

THE COURT:     Has he made a decision?

[COUNSEL]:     It's my understanding that at this time we do not wish a pre-sentence

---

barred because it had not been presented on direct appeal and the Ohio courts had relied on adequate and independent state grounds in barring post-conviction consideration of the claim.

Even assuming the claim is not barred, the jury instruction was not improper. We review jury instructions at the selection phase of the capital sentencing portion of a trial to determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Buchanan v. Angelone*, 522 U.S. 269, 275 (1998)(citations omitted). The jury instruction at issue was as follows:

The State of Ohio seeks recommendations from you of a death sentence. In order to be entitled to this recommendation the State has the burden of proving by proof beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing is sufficient to outweigh the factors in mitigation. The defendant has no burden of proof and is given great latitude in the presentation of the mitigating factors. In reaching your verdicts you are instructed that you will consider all evidence presented in the first trial, which you deem to be relevant as fully presented again in this proceeding, along with all additional evidence presented in this proceeding. To outweigh means . . . to be more important than . . . . Remember that reasonable doubt is present when after you carefully consider and compare all evidence, you can not say you are firmly convinced of the truth of the charge. Reasonable doubt is doubt based on reason and common sense. Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending upon moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs. If, after a full, fair and impartial consideration of all relevant evidence from both trials you are convinced

beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing is sufficient to outweigh the factors in mitigation then the State has proven its right to be entitled to the recommendation of the death penalty.

(J.A. at 2503-2504).

Petitioner argues that this instruction was doubly flawed. First, the court's characterization of reasonable doubt as not being "firmly convinced" refers to the clear and convincing evidence standard, not reasonable doubt. Second, instructing the jury that they were to consider whether they had reasonable doubt as to the charge, rather than whether aggravating evidence outweighed mitigating evidence, misdirected the jury toward a conclusion that had already been determined at the guilt phase of the trial.

The Supreme Court has discussed trial court definition of the reasonable doubt standard:

The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course . . . so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt . . . the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.

*Victor v. Nebraska*, 511 U.S. 1, 5 (1994)(citations omitted). Rather, the Constitution requires, taking the instructions as a whole, that there not be a reasonable likelihood that the jury understood the instructions to allow conviction based on evidence falling below the reasonable doubt standard. *Id*. Characterizing reasonable doubt as "substantial doubt" or "not a mere possible doubt" does not violate due process. *Id*.

In this case, the court described "reasonable doubt" in several ways, including "not a mere possible doubt," which

response to leading questions by the sheriff." *Rideau*, 373 U.S. at 725. In this case, Petitioner has not alleged that any particular juror was prejudiced by media coverage. Rather, Petitioner argues that such prejudice should be presumed from the extent of media coverage. However, both *Irvin* and *Rideau* involved clearly established actual prejudice. Petitioner's inference, that extensive local media coverage of his prior indictments and murder conviction ensured juror impartiality and violation of due process, is inconsistent with *Dobbert*. We find that extensive local media coverage of Petitioner's criminal activity, without more, does not violate due process.

### VII.  Ineffective Assistance of Trial Counsel

Petitioner argues that his counsel's failure to independently investigate mitigating evidence in Petitioner's personal background, and failure to present such evidence at the penalty phase of the trial, constituted ineffective assistance in violation of the Sixth Amendment. Petitioner raised this claim before the Ohio First Appellate District, the Ohio Supreme Court, in Ohio post-conviction proceedings, and in his habeas petition. Therefore, the district court correctly found that this claim is not procedurally barred, which the government does not challenge on appeal. Government Brief on Appeal at 69.

Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), for Petitioner to prevail on his ineffective assistance of counsel claim, Petitioner must show both that counsel's performance was objectively unreasonable under the Sixth Amendment, and that such deficient performance prejudiced Petitioner.

A claim of ineffective assistance of counsel presents a mixed question of law and fact; therefore we review both the state court and district court determinations *de novo*. *Carter v. Bell*, 218 F.3d 581, 591 (citing *Rickman*, 131 F.3d at 1153). Our *de novo* review includes both the performance and prejudice components of an ineffective assistance claim. *Id*. (citing *Strickland*, 466 U.S. at 698).

redressed by Petitioner's opting against execution by electrocution under § 2949.22(B).

## VI. Media Coverage/Due Process

Defendant argues that extensive media coverage in Ohio of the multiple murders for which Defendant had been indicted, as well as his prior conviction in the Walters case, denied him a fair trial. The Supreme Court has found:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court . . . extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a trial atmosphere . . . utterly corrupted by press coverage.

*Dobbert v. Florida*, 432 U.S. 282, 302-303 (1977)(citations and internal quotations omitted).

Petitioner argues that adverse publicity in his case was so pervasive and prejudicial that jury prejudice may be presumed, citing *Irvin v. Dowd*, 366 U.S. 717 (1961), and *Rideau v. Louisiana*, 373 U.S. 723 (1963). In *Irvin*, media coverage caused ninety percent of the 320 prospective jurors to have an opinion on defendant's guilt, ranging from suspicion to near certainty. *Irvin*, 366 U.S. at 727. Eight of the twelve jurors who were ultimately empaneled already considered defendant guilty. *Id*. In *Rideau*, three jurors had seen a televised "interview" with defendant "in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in

was specifically upheld in *Victor*. Petitioner has not articulated how "firmly convinced", taken together with the court's various descriptions of reasonable doubt, created a reasonable likelihood that the jury understood the instructions as establishing a clear and convincing evidence standard for determining whether aggravating factors outweigh mitigating factors. The jury instructions actually provided, both at the beginning and the end of the particular instruction at issue, that "the State has the burden of proving by proof beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing is sufficient to outweigh the factors in mitigation." (J.A. at 2503-04.) We find, both under *Victor* and its own language, that the penalty phase instruction did not violate due process.

## IV. Prosecutorial Misconduct

### A. Brady

Petitioner alleges prosecutorial misconduct in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.

Petitioner argues that the State of Ohio failed to disclose exculpatory information possessed by the F.B.I. and the Cincinnati police. Specifically, Petitioner argues that the F.B.I. was in possession of detailed and material background information on Petitioner. Petitioner's habeas application alleged ten categories of evidence that the State of Ohio had failed to disclose, including exculpatory background profiles and reports concerning Petitioner and members of Petitioner's family. Petitioner also alleged that the State of Ohio's failure to disclose such information to Petitioner's trial counsel directly and adversely affected trial counsel's ability to adequately present evidence on Petitioner's behalf at both the guilt and penalty phases of the trial.

*Brady* assures the production of exculpatory evidence material to either the guilt or penalty phases of a trial. In *United States v. Bagley*, 473 U.S. 667, 682 (1985), the Supreme Court clarified the *Brady* materiality standard: "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." The *Brady* rule does not assist a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue. *See United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990)(citing *United States v. Wilson*, 901 F.2d 378 (4th Cir. 1990)); *United States v. Hicks*, 848 F.2d 1, 4 (1st Cir. 1988); *United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988)).

The district court found that Petitioner had not shown that any of the withheld information might have assisted in his defense and concluded that Petitioner had not established that the withheld evidence would have made a difference in the outcome of the trial.

We agree with the district court that no *Brady* violation occurred in this case, but on different grounds. We agree that the State of Ohio is not ultimately responsible for the failure of Petitioner's counsel to present, at the penalty phase of the trial, any mitigating evidence in connection with Petitioner's personal background. Therefore, under *Todd*, we find no *Brady* violation. However, as detailed in the discussion of ineffective assistance of trial counsel in part VII below, we find that it is reasonably probable that presenting mitigating evidence on Petitioner's background to the jury at the penalty phase of the trial would have produced an outcome different from the death sentence. We therefore depart from the district court's finding on the materiality of the background evidence at issue.

Material evidence on Petitioner's background would have been discoverable with minimal investigation by Petitioner's counsel. Such information was available from varied sources beyond control of the F.B.I., including, as detailed in part VII

function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.

We find the Ohio requirement that aggravating circumstances be proven at the guilt, rather than penalty, phase of the trial is consistent with *Lowenfield*.

Sixth, Petitioner argues that his death sentence: (i) violates Article VI of the Constitution, under which every state is bound by terms of international treaties to which the United States is a party; and (ii) violates customary international law. The district court found this claim to be procedurally barred, and for which Defendant had not shown cause and prejudice. However, even merits review of this claim would not have afforded Petitioner habeas relief.[12]

Seventh, Petitioner argues that execution by electrocution violates the Eighth Amendment. Ohio Revised Code § 2949.22(B) provides the option for lethal injection as a form of execution. A recent amendment to Florida law, providing the option for lethal injection in place of electrocution, caused the Supreme Court to dismiss an earlier grant of *certiorari* to consider whether execution by electrocution violates the Eighth Amendment. *Bryan v. Moore*, 528 U.S. 1133 (2000). Under § 2949.22(B), execution in Ohio, like Florida, need not occur by electrocution. Therefore, Petitioner's claim may be

---

[12]Merits review of Petitioner's international treaty and customary international law claim would only have observed that to date, the claim that "international law completely bars this nation's use of the death penalty . . . is unsupportable since the United States is not party to any treaty that prohibits capital punishment per se, and since total abolishment of capital punishment has not yet risen to the level of customary international law." *United States v. Bin Laden*, 126 F. Supp. 2d 290, 294 (S.D.N.Y. 2001)(citation omitted). Customary international law, derived from the law of nations, is defined as the "general and consistent practice of states followed by them from a sense of legal obligation." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 102(2)(1987)).

Third, under § 2929.03(D)(1), it is the prosecution's burden to provide, beyond a reasonable doubt, that the aggravating circumstances outweigh mitigating circumstances. Fourth, if the jury recommends the death sentence, under § 2929.03(D)(3), the court must then independently evaluate the full record to reconfirm that the aggravating circumstances do indeed outweigh mitigating circumstances.

The Ohio scheme does not resemble the scheme in *Godfrey*, where the "Georgia Supreme Court . . . affirmed a sentence of death based upon no more than a finding that the offense was "outrageously or wantonly vile, horrible and inhuman." *Godfrey*, 446 U.S. at 428. Specifically, the aggravating circumstances under § 2929.04(A) provide "specific and detailed guidance", listing murders of the President, Vice President, Governor, law enforcement officers, or children under thirteen; murder for hire; murder to escape accountability for another crime; murder by a prisoner; repeat or mass murder; murder to prevent a criminal witness from testifying; murder by those previously convicted of violent crime; or felony murder where the offender was the principal offender in the commission of aggravated murder or committed the aggravated murder with calculation and design. We find the detailed guidance on aggravating circumstances under § 2929.04(A) to be distinguishable from the ill-defined sentencing scheme in *Godfrey*.

Fifth, Petitioner argues that the Ohio scheme, by requiring proof of aggravating circumstances at the guilt phase of the trial, fails to separate consideration of aggravating circumstances from determination of guilt, thereby failing to narrow the category of death-eligible defendants in violation of *Zant v. Stephens*, 462 U.S. 862 (1983). The Supreme Court, in *Lowenfield v. Phelps*, 484 U.S. 231, 244-245 (1988), found:

> The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing

below, school, hospital and prison records, mental evaluations, family members and acquaintances, as well as Petitioner himself. While the F.B.I. background reports and profiles would likely have provided helpful detail, the essence of Petitioner's mitigating circumstances, that his life experience had largely been characterized by violence and abuse, was independently available to Petitioner and, importantly, Petitioner's counsel. Thus, under *Todd*, the district court did not err in failing to find a *Brady* violation in this case, although we do not agree with the district court on the materiality of evidence relating to Petitioner's background, which, had it been presented to the jury, would likely have affected the outcome of the penalty phase of the trial, as indicated by part VII below.

## B. Prosecutor Testimony

Petitioner next argues prosecutorial misconduct on grounds that the Hamilton County prosecutor from the Walters case testified in the Storey case. The prosecutor was not on the prosecution team for the Storey case. The prosecutor testified in order to identify Petitioner's handwriting.

Habeas relief based on prosecutorial misconduct requires that the misconduct be so egregious as to deny petitioner due process. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974). Although "federal courts have almost universally frowned upon the practice of a Government prosecutor testifying at the trial of the case he is prosecuting, whether for or against the defendant, and have stated that the practice should be permitted only in extraordinary circumstances or for compelling reasons", a prosecutor may nevertheless testify so long as they otherwise withdraw from the trial. *United States v. Birdman*, 602 F.2d 547, 553 (3d Cir. 1979). The testifying prosecutor in this case, however, had no other role in the case.[7] Further, the scope of his testimony was narrow

---

[7] In the context of a testifying federal prosecutor, the Second Circuit has found that while testimony by any member of a United States Attorney's Staff is discouraged, such members are not disqualified as

and probative, identifying Defendant's handwriting in several motions from the Walters case, which was then compared to the handwriting on the wall directly where the victim's body was found in the Storey case. Under *Birdman*, even if the prosecutor had been assigned to this case, the prosecutor may have subsequently been able to testify upon withdrawing from the trial. Because the testifying prosecutor in this case had no other role in the trial, and testified on the narrow and important issue of identifying handwriting samples, we find that the testimony did not violate due process.

### C. Other Acts Evidence

Defendant argues that the admission of prior bad acts evidence violated due process because the evidence was inflammatory and dissimilar to the Storey case. Although Petitioner characterizes this claim as prosecutorial misconduct, he is actually challenging a state court evidentiary decision. Federal habeas courts review state court evidentiary decisions only for consistency with due process. *Patterson v. New York*, 432 U.S. 197, 202 (1977). State court evidentiary rulings do not rise to the level of due process violations unless they "offend . . . some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted).

Although Petitioner argues that the admitted other acts evidence was dissimilar to the Storey case, both the district and state courts explained its relevance. The Ohio Supreme Court stated as follows:

> The purpose of presenting [the other acts] evidence was twofold. First, the state's burden of proof on the first death-penalty specification was to show a "course of conduct" on the part of the defendant involving the killing or attempted killing of two or more persons. Second, the evidence was introduced pursuant to [Ohio

witnesses in cases where they play no other role. *See United States v. Armedo-Sarmiento*, 545 F.2d 785, 793 (2nd Cir. 1977).

death penalty decision making process is not shielded from judicial review. Further, in *Boyde v. California*, 494 U.S. 370, 374 (1990), the Supreme Court upheld a nearly identical jury instruction, where a finding that aggravating circumstances outweighed mitigating circumstances mandated recommendation of the death sentence. We find that the Ohio scheme is consistent with *Woodson* and *Boyde*.

Third, Petitioner argues that because the Ohio scheme does not require proof of a conscious desire to kill or premeditation and deliberation for imposing the death penalty, such imposition may thus be arbitrary in violation of *Furman*. While the Ohio crime of aggravated murder under § 2903.01(B) includes felony murder, which does not require prior calculation and design, imposing the death penalty for felony murder is consistent with the Eighth Amendment under *Tison v. Arizona*, 481 U.S. 137, 158 (1987), where the Supreme Court found that " major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the . . . culpability requirement" for imposition of the death penalty. We find that Ohio Revised Code § 2903.01(B) is consistent with *Tison*.

Fourth, Petitioner argues that no method of review exists under Ohio Revised Code § 2929.03 to ensure a proper weighing and consideration of mitigating factors against aggravating factors. For states imposing the death penalty, the Constitution requires that the state define the crimes for which death may be the sentence in a way that avoids standardless sentencing discretion by using "clear and objective standards" that provide "specific and detailed guidance." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980)(citations and internal quotation marks omitted). As the district court discussed in detail, the Ohio scheme provides such guidance. First, § 2929.04(A) provides that the death penalty for aggravated murder is prohibited unless one of eight aggravating circumstances can be shown. Second, if defendant is convicted of aggravated murder and an aggravating circumstance can be shown, § 2929.04(B) affords defendant great latitude in presenting mitigating factors.

As noted by four dissenting Justices in *McCleskey*, such racial disparities in the capital sentencing system cast doubt on whether capital sentencing determinations have been, in practice, particularized as required by the Eighth Amendment: "[c]onsidering the race of a defendant or victim in deciding if the death penalty should be imposed is completely at odds with [the] concern that an individual be evaluated as a unique human being." *McCleskey*, 481 U.S. at 336 (Brennan, J., dissenting). Subsequent Supreme Court decisions "have reaffirmed that the Eighth Amendment mandates an individualized assessment of the appropriateness of the death penalty." *Penry v. Lynaugh*, 492 U.S. 302, 317 (1989).

Nevertheless, *McCleskey* remains controlling law on the ability of statistically-based arguments concerning racial disparity to establish an unconstitutional application of the death penalty. Although the racial imbalance in the State of Ohio's capital sentencing system is glaringly extreme, it is no more so than the statistical disparities considered and rejected by the Supreme Court in *McCleskey* as insufficient to "demonstrate a constitutionally significant risk of racial bias affecting the . . . capital sentencing process." *McCleskey*, 481 U.S. at 313. And though the racial imbalance is, to say the least, extremely troubling, we find that the prosecutorial discretion under the Ohio death penalty scheme, and the disconcerting racial imbalances accompanying such discretion, nevertheless fall, under current Supreme Court law, within the "constitutionally permissible range of discretion in imposing the death penalty." *Id.* at 305.

Second, Petitioner argues that Ohio's scheme, as a mandatory death penalty statute, shields death penalty decisions from judicial review in violation of *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). Ohio Revised Code § 2929.03(D) provides that at the sentencing stage of a trial, a jury's finding that aggravating factors outweigh mitigating factors beyond a reasonable doubt must then result in recommending the death sentence to the court. Unlike *Woodson*, the Ohio scheme does not mandate the death penalty for any particular crime, and under § 2929.03(D), the

Revised Code §] 2945.59 to prove identity by showing that the appellant had used a similar "scheme, plan, or system" in committing other acts.

*State v. Coleman*, 544 N.E.2d at 625.[8]

The other acts evidence supported both the course of conduct and similar scheme elements by illustrating, as the Ohio Supreme Court noted, "a unique, identifiable plan of criminal activity." *Id.* at 626. The characteristics of this plan included targeting African-American pre-teen and teenage girls, theft of automobiles, murder by ligature strangulation, and discarding of corpses in abandoned buildings. Most significant, a bracelet missing from the home of a prior victim was found under the victim's body in this case.[9] Further, the prejudicial potential of such evidence was lessened by the trial court's specific instruction to the jury that finding Petitioner guilty of aggravated murder in this case required finding beyond a reasonable doubt that Petitioner had the specific intent to murder Storey.

Given the relevance of the other acts evidence to both the death penalty specification's course of conduct requirement

---

[8]Ohio Revised Code § 2945.59 provides that "any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved" where such elements are material in a criminal case.

[9]As detailed in both the Ohio Supreme Court and district court opinions, Petitioner's criminal activity in the summer of 1984 included: the abduction and murder by ligature strangulation of a nine -year old African-American girl in Wisconsin; car theft in Illinois; abduction of two nine- or ten-year old African-American girls in Indiana, one of whom was murdered by ligature strangulation; murder of a twenty-five-year old African-American woman in Indiana by ligature strangulation; car theft and battery in Michigan; murder, in Ohio, of an African-American woman and her nine-year-old daughter by strangulation, whose family bracelet was later found under the body of Storey; car theft and battery in Ohio; and an additional murder and car theft in Ohio. *See Coleman*, 544 N.E. 2d at 626 n.1.

and establishing a common scheme under Ohio Revised Code § 2945.59, as well as the clear jury instruction on the need to find specific intent as to the Storey murder to find aggravated murder in this case, we find that admission of the other acts evidence did not violate due process.

## D.  Guilt and Penalty Phase Arguments

Petitioner argues that improper closing arguments by the prosecutor at both the guilt and penalty phases of the trial violated due process.  Because Petitioner had not presented these arguments on direct appeal, the district court found them to be procedurally barred.  "It is well settled that a prisoner seeking habeas relief in federal court must have presented the claim upon which he seeks relief to the state appellate courts." *Gonzales v. Elo*, 233 F.3d 348, 352 (6th Cir. 2000).  "A habeas petitioner can only overcome procedural default in two instances. First, he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error . . . Alternatively, a defendant can show that failure to consider the claim will result in a fundamental miscarriage of justice." *Gall v. Parker*, 231 F.3d 265, 316 (6th Cir. 2000)(citations omitted). Petitioner in this case has neither attempted to demonstrate cause for failing to raise his closing arguments claims before the Ohio state courts nor show a resulting fundamental miscarriage of justice.  Accordingly, this Court may not review his prosecutorial misconduct claims in connection with closing arguments at the guilt and penalty phases of the trial.[10]

---

[10]Merits review of Petitioner's claims would not have affected the outcome of our decision.  Under *United States v. Carroll*, 26 F.3d 1380, 1387 (6th Cir. 1994), non-flagrant improper prosecutorial remarks may give rise to a new trial only if proof of defendant's guilt was not overwhelming, defendant objected to the improper remarks at trial, and the court failed to cure the error with an admonishment to the jury.  At the very least, Petitioner did not object to the remarks at trial, and thus would not be entitled to reversal under *Carroll*.

## V.  Ohio Death Penalty Scheme

Petitioner asserts, on several grounds, that the Ohio capital punishment scheme violates the Fifth, Sixth, Eighth and Fourteenth Amendments, as well as Article VI of the Constitution and customary international law, both on its face and as applied to him.

First, Petitioner highlights the disproportionate imposition of the death penalty on African- Americans in the State of Ohio as indicating an abuse of discretion by prosecutors in seeking the death penalty, as well as an arbitrary application of the death penalty in violation of the Eighth Amendment under *Furman v. Georgia*, 408 U.S. 238 (1972). Specifically, Petitioner notes the striking racial discrepancy between African-American representation in the Ohio population generally (9%), and such representation on Ohio's death row (49%).[11]

However, any statistically-based argument, like Petitioner's, concerning racial disparities in the application of the death penalty, must confront *McCleskey v. Kemp*, 481 U.S. 279 (1987). The Supreme Court in *McCleskey* established a demanding evidentiary standard for finding prosecutorial abuse of discretion in seeking the death penalty: "[b]ecause discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id.* at 297.  The proof not meeting this standard in *McCleskey* was a statistical study on the imposition of the death sentence in Georgia that found, among other racial disparities, that "prosecutors seek the death penalty for 70% of black defendants with white victims, but for only . . . 19% of white defendants with black victims.  *Id.* at 327 (Brennan, J., dissenting)(citation omitted).

---

[11]*Racial Imbalance on Death Row Prompts Call for Jury to Get Data*, THE PLAIN DEALER, August 23, 1999, 1999 WL 2378052.