*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0323P (6th Cir.)
File Name: 03a0323p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DONNIE E. JOHNSON,
    *Petitioner-Appellant,*

    *v.*

RICKY BELL,
    *Respondent-Appellee.*

No. 01-5451

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 97-03052—Bernice B. Donald, District Judge.

Argued: March 25, 2003

Decided and Filed: September 10, 2003

Before: BOGGS, NORRIS, and CLAY, Circuit Judges.

───────────────

### COUNSEL

**ARGUED:** C. Mark Pickrell, Nashville, Tennessee, for Appellant. Alice B. Lustre, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** C. Mark Pickrell, Nashville, Tennessee, for Appellant. Alice B. Lustre, Paul G. Summers, Michael E. Moore, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

NORRIS, J., delivered the opinion of the court, in which BOGGS, J., joined. CLAY, J. (pp. 14-20), delivered a separate dissenting opinion.

───────────────

### OPINION

───────────────

ALAN E. NORRIS, Circuit Judge. Donnie E. Johnson, a prisoner on death row in Tennessee, appeals from the denial of his petition for a writ of habeas corpus. 28 U.S.C. § 2254. The sole issue on appeal concerns the performance of defense counsel during the sentencing phase of the trial, which petitioner contends amounted to constitutionally ineffective assistance. The district court declined to issue the writ on this ground because it concluded that counsel satisfied the Sixth Amendment standards governing the right to effective representation as defined by *Strickland v. Washington*, 466 U.S. 668 (1984). We now affirm that judgment.

### I.

Because the scope of this appeal is limited, the underlying facts that gave rise to petitioner's prosecution, while tragic, are not germane to our discussion. They are set forth at some length in the opinion of the Supreme Court of Tennessee affirming petitioner's conviction and sentence on direct appeal. *State v. Johnson*, 743 S.W.2d 154 (Tenn. 1987), *cert. denied*, 485 U.S. 994 (1988). Suffice it to say that petitioner brutally murdered his wife, Connie Johnson, on December 8, 1984, at the camping equipment center where he worked. With the help of a co-worker, he then disposed of her body and rather ineffectively set about covering up his crime.

During his trial, petitioner was represented by retained counsel Jeff Crow and Clark Washington. Washington's background was primarily in civil practice. Crow testified in state post-conviction proceedings that he had conducted five

or six criminal trials before this one but could not remember whether the one murder trial he had second-chaired had been a death-penalty case. The sentencing phase of the trial took place over October 3 and 4, 1985. The jury found both the aggravating circumstances presented to it: 1) Johnson had previously been convicted of one or more felonies that involved the use of threat or violence; 2) the murder was especially heinous, atrocious, and cruel in that it involved torture or depravity of the mind. Although he did not testify during the guilt phase of his trial, petitioner elected to take the stand during his sentencing hearing. He denied that he killed his wife and attempted to shift the blame to his co-worker, who was on work release from prison at the time of the murder. *Johnson*, 743 S.W.2d at 156. He conceded, however, that he assisted in the disposal of his wife's corpse.

Defense counsel called only one other witness in mitigation, Robert G. Lee, a minister who had counseled Johnson and his family while he was in jail. The minister testified that Johnson had told him that "his faith in God was what was sustaining him through this ordeal. He also expressed to me that he knew that ultimately one day he would have to give an accounting of his life to God."

As mentioned, the jury returned a sentence of death. After exhausting his direct appeals, petitioner initiated a post-conviction action in the Criminal Court of Shelby County, Tennessee, alleging for the first time that he received ineffective assistance during the sentencing phase of his trial because his attorneys failed adequately to investigate or otherwise develop mitigating evidence. The court held an evidentiary hearing, which included the testimony of petitioner, certain of his family members, trial counsel, and experts on the topic of proper practices in preparing for sentencing proceedings in a capital case.

Ruby Johnson, petitioner's mother, testified that she spoke with attorney Washington once about her son's case and that "he talked very little about it to me." She met attorney Crow

only on the day of trial. According to Mrs. Johnson, she was not asked about her son's background or marriage even though he and his wife had lived next door to her since their marriage. She did not know of any problems between her son and his wife. Rather, she believed him to be a hard worker who cared for his family and raised well-mannered children. Despite this information, she was not asked to testify.

James Johnson, petitioner's father, contended that petitioner "was one of the most devoted person[s] to his family that I have ever seen," and that he was a good son, a hard worker, and a good family man. Mr. Johnson went on to assert that trial counsel asked him very little about his son's boyhood and schooling. Concerning the fact that he did not testify at trial, petitioner's father indicated that he had been willing to do so but had been advised by counsel that it would be unwise. Petitioner's brother, James C. Johnson, Jr., continued with this theme, stating that trial counsel did not ask him about his brother's background other than an earlier arrest in Ohio. Had he testified, James Johnson would have asserted that he had spent a significant amount of time with petitioner and his family and that "there was never an altercation of any kind that I remember other than fun and laughter." Like his father, James Johnson stated that he was available to testify on behalf of his brother, but trial counsel "said it would be advisable not to."

Petitioner's sister, Shirley Ward, testified that trial counsel never contacted her. She stated that petitioner was a good family man who did not have any problems at home. On cross examination, she admitted that she knew nothing of petitioner's alleged or admitted extramarital relationships.

Mary Ward, petitioner's other sister, testified that she told trial counsel that she was available to testify at trial but was never contacted by counsel. She, too, indicated that she had been with the deceased "numerous times and they had a very happy marriage." On cross examination she stated, "All I know is that Donnie loved Connie, and he would not have

killed her. And they had a happy marriage." She did not know anything about the alleged problems in petitioner's marriage.

In addition to these five family members, three other potential character witnesses testified at the hearing. A childhood friend, Barry Gray, stated that he had known petitioner to be a good friend, hard worker, and a caring family man. James Ingram, petitioner's jailer pending trial, mentioned that petitioner had caused no trouble while incarcerated and had a clean disciplinary record. And, finally, David Force, petitioner's employer, asserted that petitioner had been a good employee.

The post-conviction hearing contained contradictory testimony concerning the extent to which trial counsel contacted family members, evaluated their potential testimony, and considered asking them to testify during the sentencing phase of the proceedings. While the family members recall some fleeting contact, they uniformly contend that they were discouraged from testifying. Their position, however, is somewhat at odds with the memory of trial counsel. Jeff Crow, lead trial counsel, testified that family members indicated to him that they did not want to take the stand. According to him, "As I remember, we talked to the family. We talked to the minister. We talked to Johnson. And we decided after doing all that to handle the sentencing hearing in the manner in which it was done." Petitioner's co-counsel, Clark Washington, corroborated Crow's testimony that family members were reluctant to appear at trial. "All of them wanted to help Don Johnson," Washington testified, "but they were concerned or afraid or not wanting to really come in under the spotlight in a courtroom and take a witness chair."

The record suggests that Crow and Washington were diligent in preparing for the guilt phase of the trial but gave scant attention to the sentencing phase until the verdict was returned. In fact, Crow testified that his main preparation for

sentencing was to review the Tennessee code on death-penalty procedure while the guilt portion of the trial was under way.

On August 2, 1989, the Tennessee trial court issued an order denying post-conviction relief. The court accepted trial counsel's testimony that family members "could not or would not get involved in testifying." Any testimony from them "that [petitioner] was a good worker and had a good marriage" would have opened the door to rebuttal evidence of strains in his marriage, the court concluded. The court indicated that family members' testimony would not have been enough to overcome the jury's apparent rejection of petitioner's direct testimony and the "devastating" cross examination that followed. Citing *Strickland, supra,* the court found "nothing in the evidentiary hearing to suggest that there was any failure of counsel to meet the standards of competence required in criminal cases or that any action or inaction on their part prejudiced the case of their client."

Petitioner appealed to the Tennessee Court of Criminal Appeals, which affirmed the trial court's judgment. *Johnson v. State*, No. 61, 1991 WL 111130 (Tenn. Crim. App. June 26, 1991) (No. 61). The court reasoned as follows:

At the post-conviction hearing, members of the appellant's family testified they wished to testify at the convicting trial but were not called to do so.

These witnesses testified they would have told the jury the appellant was a hard worker who loved his family. The major flaw in this was the fact the appellant was convicted of murdering his wife.

We conclude this evidence would not have benefitted the appellant, and the failure of the trial lawyer to call these witnesses during the penalty phase of the trial gives no right to a new trial.

1991 WL 111130 at *1-2. (citation omitted). The Supreme Court of Tennessee declined to review this decision. Thereafter, petitioner initiated another, ultimately unsuccessful post-conviction challenge that is not relevant to the sole issue before us.

After exhausting his state-court avenues of redress, petitioner filed the instant habeas corpus petition on November 14, 1997, raising twenty grounds for relief. The district court denied the petition. *Johnson v. Bell*, No. 97-3052-DO (W.D. Tenn. Feb. 28, 2001). However, the district court issued a certificate of appealability pursuant to 28 U.S.C. § 2253(c) on the sole issue of whether petitioner received ineffective assistance of counsel at the sentencing phase of his trial due to the failure to investigate and present mitigating evidence.

## II.

We review de novo the legal conclusions of a district court in a habeas proceeding. *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). Because Johnson filed his habeas petition on November 14, 1997, after the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") became effective, this court's review of state court conclusions is governed by AEDPA. *Id*. Under AEDPA's provisions, we may not grant a writ of habeas corpus for any claim that was adjudicated on the merits in state court unless the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a state court proceeding.

28 U.S.C. § 2254(d). In addition, the findings of fact made by a state court are presumed to be correct and can be contravened only if the habeas petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Court interpreted 28 U.S.C. § 2254(d)(1) as requiring a distinction between decisions that are "contrary to" and those that involve an "unreasonable application of" clearly established Supreme Court precedent. *Id*. at 405. A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Id*. A state court decision is also "contrary to" Supreme Court precedent if the state court "applies a rule that contradicts the governing law set forth" in that precedent. *Id*.

A state court decision involves an "unreasonable application" of clearly established Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id*. at 407.

## III.

With these precepts in mind, we turn to the legal issue before us. At this point, the two-part test used to determine whether a criminal defendant was denied effective assistance of counsel is extremely familiar, even if the precise manner of its application continues to occupy the Court. *Compare Wiggins v. Smith*, 123 S. Ct. 2527 (2003), *and Williams v. Taylor, supra, with Bell v. Cone*, 535 U.S. 685 (2002). As the Court put it nearly twenty years ago:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Mason v. Mitchell*, 320 F.3d 604, 616 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 673-74 (6th Cir. 2001).

In assessing counsel's performance, we inquire whether "counsel's representation fell below an objective standard of reasonableness," as measured by prevailing professional norms. *Rickman v. Bell*, 131 F.3d 1150, 1154 (6th Cir. 1997) (quoting *Strickland*, 466 U.S. at 688). This objective reasonableness standard encompasses strategic litigation choices that simply fail to bear fruit. *See Strickland*, 466 U.S. at 689. To establish prejudice, moreover, a defendant must demonstrate a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In evaluating petitioner's claim, we are mindful of the Supreme Court's opinion in *Bell v. Cone, supra*, which reversed a grant of the writ by this court. *See Cone v. Bell*, 243 F.3d 961 (6th Cir. 2001). In *Cone*, we observed that counsel's presentation during the sentencing phase was a complete abdication of the attorney's role. During the guilt phase, counsel had presented evidence of his client's social history and mental state in an attempt to raise a defense of insanity. In the sentencing phase, however, counsel presented no mitigating evidence at all, made no final argument, and did

not even ask the jury to spare his client's life. *Cone*, 243 F.3d at 978. The Supreme Court reversed and, in doing so, reminded us that "a court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Cone*, 122 S. Ct. at 1854 (citing *Strickland*); *see also Mason*, 320 F.3d at 643 (Boggs, J. dissenting) (characterizing *Cone* as making "abundantly clear the extremely high standard that must be met for counsel's representation in the penalty phase to be considered constitutionally inadequate"); *but see Wiggins v. Smith*, 123 S. Ct. at 2536-37 (scope of investigation into client's "misery as a youth" fell short of the professional standards then prevailing because counsel knew of "unfortunate childhood" and there was nothing to suggest that further investigation would have been either counterproductive or fruitless); *Williams v. Taylor*, 529 U.S. at 398-99 (holding that failure to investigate petitioner's background, which was horrific, resulted in ineffective assistance as defined by *Strickland*).

We note that the present case contains elements similar to those of previous cases in which this court has been sufficiently troubled by allegations of ineffective assistance that we either granted the writ or remanded for an evidentiary hearing. Among other factors, this court has found it telling that "trial counsel did not begin preparing for the mitigation phase of the trial until after conviction." *Greer*, 264 F.3d at 676-77; *see also Williams*, 529 U.S. at 395 (finding it significant that counsel began preparation for mitigation only a week before trial). Despite *Greer* and other Sixth Circuit cases that have reached a similar result, *see, e.g., Mason*, 320 F.3d at 624-26 (remanding for evidentiary hearing concerning failure to develop mitigating evidence of petitioner's troubled childhood); *Coleman v. Mitchell*, 268 F.3d 417, 450-52 (6th Cir. 2001) (ineffective assistance during mitigation for failure to investigate or present evidence of troubled background); *Skaggs v. Parker*, 235 F.3d 261, 269-70 (6th Cir. 2001);

*Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997); *Glenn v. Tate*, 71 F.3d 1204, 1206-08 (6th Cir. 1995), we are hard-pressed to reconcile *Cone* with a conclusion that counsel rendered constitutionally ineffective assistance by not vigorously interviewing family members and pressing them to testify during the sentencing phase of the trial. While counsel in *Wiggins* had sufficient information about their client's horrific childhood to render their failure to pursue further investigation professionally unreasonable, there is nothing to suggest that counsel in the instant case ignored known leads that might have helped them to prepare their case in mitigation. As the Court has reminded us, "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 123 S.Ct. at 2541.

Even if we assume, however, that trial counsel performed ineffectively during the mitigation phase of the trial, we find that the deficiency did not prejudice petitioner's case. As already explained, to show prejudice a defendant must demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Also, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Our inquiry is limited to asking whether the testimony of the eight potential character witnesses described above, which include five family members, would have created a reasonable probability that, had the jury heard from them, its verdict would have been different.

Undoubtedly, testimony from these family members would have helped to humanize petitioner by showing the jury that they loved and valued him, that he had been a good son, brother, and parent. On the other hand, we cannot say that

this testimony would likely have led to a different result because it is entirely possible, as the Tennessee Court of Criminal Appeals pointed out, that the jury could have concluded that petitioner was even more culpable because he had enjoyed a loving family but had brutally murdered a wife who loved him. Also, as the district court noted, testimony from family members would have opened the door to rebuttal evidence about petitioner's extramarital affairs, undercutting the positive image presented by his family.

The mitigating evidence proffered by petitioner falls short of the quantum required by *Wiggins*, *Cone*, and *Williams*. In *Williams*, for example, the Court found it unreasonable for the Virginia Supreme Court to conclude that petitioner had not been prejudiced by counsel's failure to investigate and present readily available evidence "graphically describing Williams' nightmarish childhood." 529 U.S. at 395, 397-98. Likewise in *Wiggins*, the Court concluded, "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." 123 S. Ct. at 2543. This court's cases do not particularly strengthen petitioner's position either. *See, e.g., Coleman*, 268 F.3d at 451-53 (finding prejudice where counsel failed to present evidence of petitioner's horrific childhood, his numerous mental and emotional disorders, and his low IQ); *Carter v. Bell*, 218 F.3d 581, 600 (6th Cir. 2000) (finding prejudice where counsel failed to present evidence "of a childhood in which abuse, neglect and hunger were normal"); *Skaggs*, 235 F.3d at 271-72 (finding prejudice for failure to present evidence of defendant's mild mental retardation and diminished capacity, "the one topic which may have convinced the jury that a death sentence was not justified"). Given the precedents that inform our decision, we conclude that, even if we assume that trial counsel were professionally deficient under the Sixth Amendment for failing to present mitigating testimony in the form of character witnesses, petitioner has not shown that, "but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## IV.

The judgment of the district court is **AFFIRMED.**

## DISSENT

CLAY, Circuit Judge, dissenting.    In holding that Petitioner's counsel's performance did not fall below an objective standard of reasonableness as measured by prevailing professional norms, the majority engages in speculation and conjecture about what evidence defense counsel's investigation would have turned up and the nature of various witnesses' testimony had defense counsel performed in accordance with acceptable professional standards in death penalty litigation. In so doing, the majority resolves all doubts against Petitioner and holds that none of the evidence Petitioner's counsel might have garnered would have sufficiently impacted the jury's decision-making to alter the outcome of the penalty phase trial.    Contrary to the majority, I believe that the record is too conflicted as to whether potential witnesses would have been willing to testify, and the nature of the testimony is too sparse to permit the formation of a reliable opinion as to whether counsel's investigation into Petitioner's family, social, or psychological history was adequate under an objective standard.    Thus, I would remand for an evidentiary hearing so that the record could be developed as to counsel's investigation in this regard, thereby allowing for an informed decision as to whether Petitioner was prejudiced and ultimately denied his Sixth Amendment right to effective assistance of counsel.

Petitioner claims that his trial counsel provided ineffective assistance during the penalty phase of the trial by failing, among other things, to investigate into Petitioner's family, social, or psychological background for mitigating evidence; failing to present Petitioner's family members, friends, and employer as mitigating witnesses; and failing to prepare Petitioner to testify to mitigating evidence.    Petitioner's case thus primarily turns on whether counsel's investigation of his family, social, and psychological history was adequate to

justify their strategy of presenting a single witness other than Petitioner on Petitioner's behalf at mitigation. As in the Supreme Court's recent decision in *Wiggins v. Smith*, ___ U.S. ___, 123 S. Ct. 2527, 2538-539 (2003), if counsel's investigation was itself inadequate, counsel's strategic choice of only presenting two witnesses on Petitioner's behalf at mitigation must also be considered objectively unreasonable under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See Wiggins*, 123 S. Ct. at 2538-539 (recognizing that "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation'") (quoting *Strickland*, 466 U.S. at 690-91).

The majority attempts to distinguish *Wiggins* by concluding that there is there is nothing on the record that should have caused counsel to delve deeper into Petitioner's family, social, or psychological history. However, the majority reaches this conclusion based on the limited nature of the testimony and evidence derived from Petitioner's post-conviction hearing which, as indicated, is too sparse and conflicted to make such a determination at this point of the proceedings. That is not to say that upon further review by way of an evidentiary hearing the result reached by the majority would necessarily be different. But in a case where a petitioner's life rests upon the nature of the evidence presented, it is imperative that the petitioner be allowed to present all of the evidence necessary for the court to make an informed decision. This is particularly so in a case such as this where, aside from Petitioner, the sole witness called on Petitioner's behalf was a minister whose testimony that Petitioner had expressed that "he knew that ultimately one day he would have to give an accounting of his life to God[,]" may have actually worked against him.

Moreover, even upon this sparse record, there is evidence to indicate that counsel should have delved deeper into Petitioner's past family, social, and psychological history. For example, at the hearing on the first post-conviction

petition, Petitioner testified that prior to trial he provided trial counsel with the names of a number of witnesses who could testify on his behalf, including family members, his friend Barry Gray, and others who could rebut evidence that Petitioner's marriage was rocky. A number of Petitioner's family members and acquaintances testified at the post-conviction hearing. Some of them indicated that they would have offered testimony sympathetic to Petitioner but were not called to testify or were never contacted by defense counsel. The contention of Petitioner's counsel that a number of the potential witnesses were not inclined to testify is disputed by several of them.

Specifically, Petitioner's mother, Ruby Johnson, testified that trial counsel did not ask her about Petitioner's background; however, she also testified that if asked, she would have told counsel and the jury that she did not know of any problems in Petitioner's marriage, and that he was a hard worker who cared for his family and raised well-mannered children. Likewise, Petitioner's father, James Johnson, testified at the post-conviction hearing that, if called, he would have testified that Petitioner was devoted to his family and that he was a good son, a hard worker, and a good family man. Petitioner's father also testified that trial counsel asked him "very little" about Petitioner's background and schooling, and that when he offered to testify at the mitigation hearing, counsel stated that it would be better not to offer any testimony by family members. (J.A. at 188.)

Petitioner's brother, James Johnson, Jr., similarly testified that trial counsel did not ask about Petitioner's background, "[n]othing other than his arrest in Ohio, things of that nature[,]" despite the fact that Johnson had spent a significant amount of time with Petitioner and his family, and that he was willing to testify that he never knew of any problems in Petitioner's marriage. (J.A. at 188.) Johnson also testified that he advised defense counsel that he was available to testify on behalf of Petitioner at the mitigation trial, but that counsel said "it would be advisable not to." (*Id.*)

Petitioner's sister, Shirley Ward, testified that she was never contacted by trial counsel; however, if called upon she would have testified that Petitioner was a good family man who did not have any problems at home, and that the relationship between her brother and his wife seemed harmonious and happy the weekend before the murder. Petitioner's other sister, Mary Ward, testified that she told trial counsel she was available to testify at trial and that, if called, she would have testified that Petitioner loved his wife and would not have killed her.

Barry Gray, who had been a friend of Petitioner since childhood, testified at the hearing that he would have informed the jury that Petitioner was a good friend and a hard worker who seemed to care and provide for his family. Officer James Ingram, a deputy jailer with the Shelby County Sheriff's Department, testified at the hearing that when Petitioner was incarcerated, "[h]e never had a disciplinary write-up or anything to my knowledge[,]" and that he would have been willing to testify to this effect at Petitioner's mitigation trial but did not receive a subpoena. (J.A. at 189-90.) David Force, an owner of Force Camping where Petitioner worked, also testified at the hearing and stated that, if asked, he would have said that Petitioner was a good employee.

Petitioner also presented expert testimony at the post-conviction hearing as to the manner in which background investigations should be performed in capital cases in Tennessee. That is, Jeff Blum, administrator of the Capital Case Resource Center, testified about the necessity of speaking extensively with persons who had contact with Petitioner or his family members. Blum stated that:

> We do a fairly extensive search of all the various points of contact an individual would have had sometime in their past life. And through that process, gathering as much written material, papers, files, records that we can in that process toward discovering information we feel

may be helpful in mitigation, and at the same time, gathering names of other individuals who may be helpful in testifying on behalf of the defendant.

(J.A. at 191-92.)

Thus, even in light of the record before us, there is clear indication that defense counsel should have investigated further into Petitioner's family, social, and psychological history before making the strategic choice to present only one other witness aside from Petitioner at the mitigation hearing. The statements made by Petitioner's family, close friends, and employer provided a basis upon which counsel should have known that further inquiry into Petitioner's past was needed for the purpose of allowing these witnesses to convince as few as one juror that Petitioner was someone undeserving of the death penalty. Further factual development by way of an evidentiary hearing may serve to support this conclusion thereby establishing that counsel failed to conduct an adequate investigation; this is particularly so where, in addition to the above testimony, the record indicates that counsel failed to obtain any medical, school, or social service records concerning Petitioner.

Indeed, Respondent does not contest that trial counsel's performance during the penalty phase of the trial fell below an objective standard of reasonableness. Rather, Respondent only contests the second prong of *Strickland*–whether trial counsel's failure to investigate and present mitigating evidence prejudiced Petitioner. *See Strickland*, 466 U.S. at 687. Respondent argues that no prejudice occurred to Petitioner because the evidence merely consisted of family members' statements that Petitioner was a good family man who had a happy marriage, and a good friend and employee.

The fallacy in Respondent's argument, however, is that it assumes that the only mitigating evidence trial counsel could have presented was the testimony of Petitioner's family members, friends, and employer, and it assumes that the

nature of these witnesses' testimony was adequately developed. A proper investigation into Petitioner's background and the nature of the witnesses' testimony may have revealed other mitigating evidence to persuade the jury to sentence Petitioner to life in prison as opposed to death. Because there is no evidence on the record of what an investigation of Petitioner's background would have revealed, this Court cannot conclude that Petitioner was not prejudiced by trial counsel's failure to investigate and present mitigating evidence. Thus, this case should be remanded with instructions that the district court conduct an evidentiary hearing on Petitioner's claim for further factfinding as to the scope of counsel's investigation and the nature of what evidence, if any, further investigation would have revealed. *See Mason v. Mitchell*, 320 F.3d 604, 620-21 (6th Cir. 2003) ("Because the record as it now stands reflects disputes about defense counsel's performance with respect to the sentencing phase of [the petitioner's trial], we remand the case to the district court for an evidentiary hearing on this issue.").

Similarly, the majority's contention that the error, if any, was harmless because testimony as to Petitioner's character as a loving husband or family man would have opened the door to potentially unfavorable testimony, is also based on speculation. That is to say, on the record before us, it is impossible to conclude that any unfavorable testimony that may have come into evidence by way of favorable character evidence would have unanimously persuaded a jury that the unfavorable testimony outweighed the favorable testimony. *See id.*

The record before the Court, although needing further factual development, provides clear indication that Petitioner's trial counsel failed in their responsibility to investigate and present mitigating evidence at Petitioner's penalty phase trial. Contrary to the majority's conclusion, it cannot be determined, based upon the present record, whether proper representation of Petitioner at the penalty phase trial would have resulted in a different outcome. Since the record

fails to establish whether the scope of counsel's investigation was adequate under *Strickland*, it cannot be said at this juncture whether Petitioner was prejudiced by counsel's performance. *Compare Wiggins*, 123 S. Ct. 2358-539. Thus, I would remand for an evidentiary hearing. Only by so doing could we determine whether Petitioner received constitutionally adequate representation before requiring Petitioner to pay the ultimate penalty. *See Mason*, 320 F.3d at 620-21 (remanding the death penalty petitioner's ineffective assistance of counsel claim for an evidentiary hearing where the record was inadequate to allow for meaningful appellate review as to whether counsel performed an adequate investigation and preparation as to mitigating evidence); *see also Griffin v. United States,* 330 F.3d 733, 739 (6th Cir. 2003) (remanding the petitioner's § 2255 motion to the district court for an evidentiary hearing where the petitioner "presented a potentially meritorious claim for ineffective assistance of counsel" while noting that the petitioner "deserve[d] the right to develop a record" in order to demonstrate prejudice). I therefore respectfully dissent.