CLAY, Circuit Judge,
dissenting.
This is the second time the majority has denied Petitioner the opportunity to have a hearing on allegations of very serious constitutional deprivations. In Johnson v. Bell, 344 F.3d 567 (6th Cir.2003), the majority denied Petitioner an opportunity to have a hearing on whether his trial counsel’s performance was constitutionally deficient in failing to properly investigate mitigating circumstances in the penalty phase trial. As the dissent noted at that time, “The record before the Court, although needing further factual development, provides clear indication that Petitioner’s trial counsel failed in their responsibility to investigate and present mitigating evidence at Petitioner’s penalty phase trial. Contrary to the majority’s conclusion, it cannot be determined, based upon the present record, whether proper representation of Petitioner at the penalty phase trial would have resulted in a different outcome.” Id. at 578 (Clay, J., dissenting). In that case, Petitioner was entitled to an evidentiary hearing on his ineffective assistance of counsel claim, just as he is on his claim of fraud on the court in this case.[1]
The district court in the instant case should have held an evidentiary hearing on whether the state committed fraud on the court in the initial habeas proceedings. The majority rejects Petitioner’s allegations based on its assertion that Petitioner has failed to come forward with “clear and convincing” evidence of fraud on the court.[2] Notwithstanding the majority’s *342 contentions, Petitioner has undoubtedly raised sufficient questions which should entitle him to an evidentiary hearing on the issue. This is so because if Petitioner was convicted based upon false testimony which was the product of collusion between the prosecutor and the prosecutor’s principal witness, then the false testimony would constitute fraud directed at the “judicial machinery” of the court sufficient to compromise the court’s integrity. See Demjanjuk v. Petrovsky, 10 F.3d 338, 348 (6th Cir.1993) (noting that fraud on the court is a “fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication”).
The circumstances surrounding Ronnie McCoy’s initial testimony at Petitioner’s trial strongly suggest that McCoy and the prosecution made some sort of deal to protect McCoy from incriminating himself. At the time of the murder, McCoy was on work release from incarceration on a burglary charge. McCoy initially denied knowing anything about the murder of Connie Johnson. Three weeks after the murder, he completely changed his story and came forward to implicate Petitioner. McCoy proceeded to tell police — -and then testify under oath — that he discovered Connie Johnson’s body, helped Petitioner clean the crime scene, and then disposed of the body in a parking lot. He decided to come forward, in his words, because he did not “need any more time.”
Despite McCoy’s acknowledgment of his role in disposing of Connie Johnson’s body, and the possibility that he might have been involved in her murder, his work release status was not revoked. In fact, McCoy was paroled only two months later. While on parole, McCoy took the witness stand and testified under oath about his participation in helping to clean up the crime scene and dispose of the body of the murder victim. Even if one takes into account the possibility that McCoy arguably could have been coerced, it is nonetheless incredible to contend that a witness would give such incriminating testimony with no assurance of immunity from prosecution. As the Tennessee Supreme Court found in rejecting Petitioner’s appeal: “In all events, however, [Petitioner and McCoy] collaborated, willingly or otherwise, in transporting the body of Mrs. Johnson in her 1981 Ford van from the sales office to a shopping center a few miles away. They also placed inside the van her broken spectacles, her shoes, her coat and some earrings which had become dislodged in her struggle for breath. They parked the van on the edge of a large shopping center and left it there.” Later the court acknowledged that McCoy may have been an accomplice. State v. Johnson, 743 S.W.2d 154, 156-57 (Tenn.1987).
Notwithstanding the risk McCoy took in providing this sworn testimony, the prosecutor and McCoy both assert in affidavits submitted to the district court that McCoy took this step without any deal or promises of immunity. The prosecutor acknowledged that McCoy’s testimony “would have provided sufficient probable cause to obtain an indictment for improper disposal of *343 a body, and possibly accessory after the fact to murder.” The prosecutor further asserted, however, that he “felt it was unlikely that it could be proven that [McCoy’s] participation [in the murder] was willing.” (J.A. 186-87). The state’s official position is that it had no leverage over McCoy, thereby impliedly suggesting that McCoy came forward and testified under oath to his participation in a murder with no assurances from the prosecutor about any future immunity. Furthermore, while it may have been a challenge for the prosecutor to prove McCoy’s participation in the actual murder, it would have been equally difficult for the state to prove that Petitioner committed the crime without McCoy’s testimony. Therefore, the prosecution was in the position where it needed McCoy’s testimony to gain a conviction against Petitioner in the brutal murder of his wife. Nonetheless, the state asserts that it was able to obtain full participation from McCoy, a possible accomplice with a criminal history, without offering him any deal. At the very least, the prosecution’s proposed version of events strains credulity; however, the submission of the prosecutor’s and McCoy’s affidavits in the habeas proceedings, without more, might be insufficient to prove that their actions constituted a fraud on the court — which is the very reason that the interests of justice require an evidentiary hearing where witnesses can be subjected to cross-examination.
It is significant that Petitioner also obtained evidence that McCoy had told a very different story in another context. A 1988 presentence report in a separate case quotes McCoy as saying that he had received immunity from prosecution for testifying against Petitioner. In McCoy’s affidavit presented in the initial habeas proceedings, he claims he does not know how the immunity statement got into his presentence report. Subsequent to the original habeas proceedings, Petitioner obtained a declaration from Wayne Morrow, the probation officer who prepared the presentence report. In the declaration, Morrow swears under penalty of perjury that the statement came from McCoy. Therefore, Petitioner has come forward with the sworn testimony of a person with no incentive to lie which states that McCoy had previously claimed he received immunity for testifying against Petitioner.
The district court — and now the majority — dismisses this evidence based on affidavits provided by the prosecutor, McCoy, and Petitioner’s trial counsel. The affidavit from Petitioner’s trial counsel does not buttress the prosecution’s argument; the affidavit emphasizes that the “state made clear” that it would not prosecute McCoy. The affidavit does not make clear what was the basis for that assertion or how McCoy could risk admitting involvement in a murder without some guarantee that the prosecution would be true to its position. Furthermore, Petitioner’s trial counsel’s lack of knowledge about a deal would hardly be surprising. If there were a deal which the prosecutor was attempting to conceal, Petitioner’s trial counsel would be the last person that the prosecutor would want to know about it. Although Petitioner’s trial counsel attempted to question McCoy at trial about the existence of a deal that McCoy might have had with the prosecutor to provide testimony in exchange for the prosecutor’s promise not to prosecute, McCoy simply denied that any deal had been agreed to.
The distinct court emphasized that McCoy and the prosecutor were the only ones with “contemporaneous personal knowledge concerning the matter,” but they are also the people who would have the strongest motivation to conceal any deal that existed. It seems extraordinary just to accept their affidavits as credible *344 simply because they claimed to have had contemporaneous knowledge, particularly where McCoy has been inconsistent and contradictory over time as to whether he was promised immunity by the prosecutor.
Therefore, in considering McCoy’s inconsistent positions and the other evidence of an undisclosed deal, the proper course would have been to hold an evidentiary hearing; and this Court should remand this case for such a hearing to be conducted. At such an evidentiary hearing, the district court could consider the testimony of the witnesses, including McCoy and the prosecutor, subject to cross-examination, and determine the credibility of the witnesses and whether the affidavits that were submitted in the initial habeas proceedings were fraudulent. If the district court finds the witnesses credible, it could then conclude that no deal was made, and thus no fraud on the court occurred.
An evidentiary hearing is assuredly a reasonable response to serious allegations of fraud on the court. This Court’s most thorough evaluation of a Rule 60(b) motion based on fraud on the court took place in Demjanjuk v. Petrovsky, 10 F.3d 338, 348 (6th Cir.1993). In that case, this Court had previously denied the habeas petition of Demjanjuk, an alleged Nazi war criminal. See Demjanjuk v. Petrovsky, 776 F.2d 571 (6th Cir.1985). Subsequently, the Court became aware of possible exculpatory evidence that might not have been disclosed to Demjanjuk. Rather than simply conduct an evidentiary hearing, the Court then reopened proceedings and eventually took the much more resource-intensive step of convening a special master to “take testimony and prepare a report on the issue of whether failure of government attorneys to disclose exculpatory information in their possession constituted prosecutorial misconduct or fraud upon the court that misled the court into allowing Demjanjuk to be extradited.” Demjanjuk, 10 F.3d at 339. Following the special master’s report, the Court determined that fraud on the court had been committed and vacated its previous judgment allowing for extradition.
In this case, a remand for an evidentiary hearing is undoubtedly preferable to the majority’s position that if the parties to an undisclosed deal continue to assert that no deal exists, it should be impossible for a petitioner to even get the chance to test their assertions by cross-examination. “A rule ... declaring ‘prosecutor may hide, defendant must seek’ is not tenable in a system constitutionally bound to accord defendants due process.” Banks v. Dretke, 540 U.S. 668, 696, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004). Quite simply, without a chance to cross-examine McCoy, the prosecutor, and possibly other witnesses, Petitioner could never prove the existence of a deal. Even though there may have been a deal between McCoy and the prosecution, as seems likely, apparently there is no quantum of evidence, circumstantial or otherwise, that could convince the majority that an evidentiary hearing is warranted.
The events surrounding McCoy’s testimony, in addition to his statements to Morrow, raise a strong probability that a deal was reached that should have been disclosed in conformity with Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Our case law is abundantly clear that “even unspoken, tacit agreements or mutual understandings may constitute evidence favorable to the accused that must be disclosed.” Akrawi v. Booker, 572 F.3d 252, 263 (6th Cir.2009). This rule was emphasized in our en banc ruling in Bell v. Bell, 512 F.3d 223 (6th Cir.2008). There, we did not find a Brady violation, but the prosecutor who may have made a deal specifically testified before the district court on the witness stand that no *345 agreement of any kind had been made. If the prosecutor and McCoy so testify in this case, and the district judge were to credit that testimony, the matter would be settled in the prosecution’s favor. Instead, the majority argues for allowing the prosecution to merely file unchallenged affidavits where the very nature of the evidence allegedly withheld prevents Petitioner— without the aid of the truth-seeking device of cross-examination- — -from discovering irrefutable proof that a deal existed. As the Supreme Court has noted, cross-examination is the “greatest legal engine ever invented for the discovery of truth.” California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).
Because the record before this Court indicates a very real possibility that McCoy and the prosecutor had, at a minimum “reached a mutual understanding, albeit unspoken” that McCoy would not be prosecuted, Bell, 512 F.3d at 233, an evidentiary hearing should be held to determine whether the affidavits submitted in the initial habeas proceeding constituted a fraud on the court. Only in that way might we be assured that due process has been afforded, that justice has been done, and that we have avoided the consequences of a mistake, recognizing as we must in a death penalty case such as this that “death is special.”
I therefore respectfully dissent.

. Not only is there a potential violation of Petitioner’s right to counsel (see Johnson, 344 F.3d at 575 (Clay, J., dissenting)) and a potential Brady violation based on the withholding of evidence, but Petitioner's claim of prosecutorial misconduct should also succeed on the merits. The prosecutor’s statements giving rise to the prosecutorial misconduct claim were inexcusable and clearly violated Petitioner's due process rights. The prosecutor improperly vouched during the trial that he believed McCoy “was truthful. I believe he got on the stand and bared all” and further that “I submit to you that he got on the stand and bared all. Told you the truth.” These statements clearly run afoul of the principle that ”[i]t is patently improper for a prosecutor ... to comment on the credibility of a witness.” Hodge v. Hurley, 426 F.3d 368, 378 (6th Cir.2005). Despite the prosecutorial misconduct evident in this case, I will not address that claim because Petitioner seems unlikely to prevail on the claim for the procedural reasons set forth by the majority opinion.

. The issue of the procedural prerequisite for the granting of a certificate of appealability in regards to Rule 60 motions is in some flux. In United States v. Hardin, 481 F.3d 924, 926 *342 (6th Cir.2007), we found that a petitioner "must obtain a certificate of appealability before his appeal of the denial of his Rule 60(b) motion can be heard." In Kincade v. Sparkman, 117 F.3d 949, 953 (6th Cir.1997), the Court held that "district courts must be the initial decision-maker” in a certificate of appealability determination. However, Hardin postdates Petitioner’s appeal to this Court, thereby possibly permitting us to excuse the failure to first seek a certificate of appealability in the district court. Since the majority in the instant case addressed the issue on the merits, it is not necessary to resolve this issue, and this dissent will likewise reach the merits.